**Anthony TSARBOPOULOS, Petitioner,**

**v.**

**Kristi Lee TSARBOPOULOS, Respondent.**

**No. CS–00–0083–EFS.**

United States District Court, E.D. Washington.

Nov. 19, 2001.

Peter John Karademos, Spokane, WA, for Harilaos Alexandros Tsarbopoulos, Ionna Isabella Tsarbopoulos, Iason Antonis Tsarbopoulos.

Allen M. Gauper, Salina Sanger & Gauper, Spokane, WA, Peter John Karademos, Spokane, WA, for Anthony Tsarbopoulos.

Mary Elizabeth Schultz, Mary E. Schultz & Associates PS, Spokane, WA, for Kristi Lee Tsarbopoulos.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW: ORDER DENYING PETITION FOR RETURN OF CHILDREN UNDER THE HAGUE CONVENTION**

SHEA, District Judge.

### I. PROCEDURAL HISTORY

On March 10, 2000, Dr. Anthony Tsarbopoulos ("Dr.Tsarbopoulos") commenced this action by filing a Petition under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (the "Hague Convention"); 42 U.S.C. § 11601 *et. seq.* to which both the United States and Greece are signatories. (Ct. Rec.1). This Court has jurisdiction over actions brought under the Hague Conven-

tion through the International Child Abduction Remedies Act ("ICARA"), which implements the Hague Convention in the United States. *See* 42 U.S.C. § 11601 et. seq. A hearing on cross motions was held on April 25, 2000, before another judge of this District. That Court ordered the children returned to Greece on May 5, 2000 at the expense of the father, Dr. Tsarbopoulos. (Ct.Rec.42). Kristi Tsarbopoulos filed an appeal on May 3, 2000. (Ct.Rec.46). An amended order was entered by that Court on May 4, 2000, (Ct.Rec.44). On November 17, 2000, the Ninth Circuit Court of Appeals filed a Memorandum reversing the order granting summary judgment to Dr. Tsarbopoulos, finding genuine issues of material fact on the question of habitual residence. The Ninth Circuit also found genuine issues of material fact precluding summary judgment on the issue of "whether there is a 'grave risk' that returning the children to Greece would expose them to physical or psychological harm or otherwise place them in an intolerable situation." The latter issue, if proven by clear and convincing evidence, would trigger the exception to return of the children found in Article 13(b) of the Hague Convention.

The Ninth Circuit mandate was filed on November 22, 2000 in this District, (Ct. Rec.54), and the Case was reassigned on November 30, 2000, (Ct.Rec.55). The Court convened a status conference with counsel for the parties on December 7, 2000 and then issued a Scheduling Order setting a five-day evidentiary hearing for March 26, 2001, (Ct.Rec.57). On December 21, 2000, during a hearing to address visitation throughout the pendency of the case, counsel for Kristi Tsarbopoulos suggested rescheduling the evidentiary hearing because of the difficulty in contacting experts during the Holidays. Counsel for Dr. Tsarbopoulos had no objection. By Order dated December 22, 2000, the evidentiary hearing was reset to May 21, 2001, (Ct.Rec.69).

On January 19, 2001, there was a substitution of counsel for Dr. Tsarbopoulos, (Ct. Rec.77). On March 21, 2001, Kristi Tsarbopoulos filed a motion to continue the date set of the evidentiary hearing, (Ct. Rec.90). Based on the discussion of counsel during the hearing on that motion, on April 19, 2001, the Court reset the trial for August 27, 2001, (Ct.Rec.96). Trial began on that date and ended on August 31, 2001. At the close of the evidence, the Court took the matter under advisement. On November 6, 2001, the Court notified the parties, by a facsimile letter to counsel, that the Petition had been denied and that a written decision would follow.

For the reasons stated herein, the Court finds that there was no shared habitual residence in Greece, and therefore finds that the removal was not wrongful. In the alternative, the Court finds that, assuming Greece was the habitual residence of the children, their return to Greece would pose a grave risk of physical and psychological harm or would be an intolerable situation and that they are well settled in the state of Washington and therefore, concludes as a matter of law that the Article 13(b) exception applies. The Court also finds that any undertakings offered by the Petitioner are insufficient to persuade the Court to return the children despite the applicability of the Article 13(b) exception. Thus, after careful review of the evidence presented, the Court enters the following findings of fact and conclusions of law, and orders that the Petition be DENIED.

## II. HABITUAL RESIDENCE

### A. Law—Habitual Residence

When Congress enacted the law adopting The Convention on the Civil Aspects of

International Child Abduction ("Hague Convention"), it found that:

> (1) The international abduction or wrongful retention of children is harmful to their well-being and ... (4) The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980, establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights. Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies....

42 U.S.C. 11601 *et. seq.* This language is consistent with the objectives of the Hague Convention as those objectives are discussed in *Rapport Explicatif/ Explanatory Report:* E. PÉREZ-VERA, Hague Conf. on Private Int'lLaw, 14th Sess., Vol. III., 1980, p. 426, ¶ 16, p. 429 (hereinafter "Pérez–Vera Report"). This report is generally recognized as the official history of the convention. *See Mozes v. Mozes,* 239 F.3d 1067, 1069 n. 3 (9th Cir.2001). Pérez–Vera described the main objective of the Hague Convention as "the restoration of the *status quo* by means of 'the prompt return of children wrongfully removed to or retained in any Contracting State.'"

The Pérez–Vera Report states: "the Convention applies to children of less than sixteen years of age, who were 'habitually resident in a Contracting State immediately before any breach of custody or access rights.'" Pérez–Vera Report at ¶.76 P. 449. To determine then whether the Hague Convention applies, the threshold question is whether the children were habitually resident in a contracting state. *Id.* at 449, 450. In discussing the conventions subject matter, Ms. Pérez-Vera says:

> Firstly, we are confronted in each case with the removal from its *habitual environment* of a child whose custody who had been entrusted to and lawfully exercised by a natural or legal person. Naturally, a refusal to restore a child to its own environment after a stay abroad to which a person exercising the right of custody had consented must be put in the same category. In both cases, the outcome is in fact the same: the child is taken out of the family and social environment in which its life has developed ...

*Id.* at ¶ 11, p. 428 (emphasis added).

The *Mozes* court stated:

> The key operative concept of the Convention is that of 'wrongful' removal or retention. In order for a removal or retention to trigger a state's obligations under the Convention, it must satisfy the requirements of Article 3:
>
> > The removal or the retention of a child is to be considered wrongful where—
> >
> > a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> >
> > b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Mozes,* 239 F.3d at 1070 (citations omitted). According to *Mozes,* the answer to that question requires the District Court to answer the following questions:

> (1) When did the removal or retention at issue take place?

(2) Immediately prior to the removal or retention, in which state was the child habitually resident?

(3) Did the removal or retention breach the rights of custody attributable to the petition under the law of the habitual residence?

(4) Was the petitioner exercising those rights at the time of the removal or retention?

*Id.* at 1070. The Court therefore examines each of these questions in turn.

The first question is easily answered: it is undisputed that Kristi Tsarbopoulos removed her children from Greece on January 12, 2000.

As to the second question, the Court notes that the Hague Convention does not define the term "habitual residence." As explained in *Mozes,* "Courts have been instructed to interpret the expression 'habitual residence' according to 'the ordinary and natural meaning of the two words it contains [, as] a question of fact to be determined by reference to all the circumstances of any particular case.'" *See Mozes,* 239 F.3d at 1071 (citing *C v. S, (minor: abduction: illegitimate child* [1990] 2 All E.R. 961, 965 (Eng.H.L.))).

The *Mozes* Court concluded, "[t]he question in these cases is not simply whether the child's life in the new country show some minimal 'degree of settled purpose,' but whether we can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child 'out of the family and social environment in which its life has developed.'" *Mozes,* 239 F.3d at 1081 (citations omitted).

With children of the ages of the Tsarbopoulos children, "the intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence." *Id.* at 1076

(citations omitted). The Court then must determine if the parents "shared a settled mutual intent" to abandon the children's prior habitual residence for a new one. *Id.* at 1078. This requires the Court to closely examine all of the facts of this particular case as directed by *Mozes.*

## B. Facts—Habitual Residence

Anthony Tsarbopoulos was born in Greece in 1957 and graduated from the University of Athens in 1980. After graduation, he came to the United States and attended Michigan State University between the years 1980 and 1985 where he obtained his Ph.D. in Chemistry. While at Michigan State University, he met Kristi Tsarbopoulos. *They* married in 1986 in Ohio in a civil ceremony, and in a religious ceremony in Greece in 1987. From 1985 to 1987, Dr. Tsarbopoulos was a senior post-doctoral fellow at the Department of Pharmacology at the Mayo Clinic and Foundation in Rochester, Minnesota. The family then relocated to New Jersey, where Dr. Tsarbopoulos was employed at Schering–Plough Research Institute in New Jersey. Dr. Tsarbopoulos worked for Schering–Plough from 1987 until February of 1998. Dr. Tsarbopoulos became a naturalized citizen of the United States in 1991. Dr. and Mrs. Tsarbopoulos had three children: Hari (Harilaos) born October 21, 1992; Joanna (Ioanna) born November 24, 1995; and Jason (Iason) born July 28, 1997. All of the children were born in Morristown, New Jersey. Accordingly, the children are citizens of the United States. Dr. Tsarbopoulos had family in Greece and the Tsarbopoulos family made annual visits to Greece to visit his family. Hari and Joanna were both baptized in Greece and both had godparents in Greece who were friends of Dr. Tsarbopoulos. From approximately October of 1997 through the present, Dr. Tsarbopoulos has been the director of the analytical labora-

tory, of the GAIA Research Center, at the Goulandris Natural History Museum ("Goulandris Museum") in Greece.

While dating and after marrying, Dr. Tsarbopoulos was physically abusive towards his wife, Kristi Tsarbopoulos. This physical abuse involved pinching, punching, and pushing. Helen and Costa Tsonopoulos of New Jersey, knew Dr. and Mrs. Tsarbopoulos from the late 1980's to 1997, when the Tsarbopoulos family moved to Greece. Costa Tsonopoulos was born in Greece, came to the United States in 1960, obtained his Ph.D. in chemical engineering in 1970, and has remained here since. The Tsonopouloses described Dr. Tsarbopoulos as the decision maker in the marriage, whom Kristi Tsarbopoulos obeyed in all matters. They also described Dr. and Mrs. Tsarbopoulos as being socially isolated. Kristi Tsarbopoulos recalls in these years that the friends of her husband became their only friends. She had decreased contact with her family, except for requests for money at the insistence of Dr. Tsarbopoulos. For example, Dr. Tsarbopoulos directed Kristi to request money from her family for a down payment for a condominium and later, for a home while they were living in New Jersey.

Although her parents frequently declined to provide money, a pattern was established. Kristi Tsarbopoulos repeatedly had to borrow money from her parents either because Dr. Tsarbopoulos would refuse to pay for various expenses or she was frightened about his reaction when an expense was incurred. For example, when she was involved in a car accident which totaled her car, her parents paid her the deductible amount on the car because she was fearful about the reaction of Dr. Tsarbopoulos to the loss of the car. Eventually, Kristi received a settlement of $16,000 for the claim arising out of that collision. As Dr. Tsarbopoulos controlled the finances of the couple, the money was

deposited into the Citibank account to which she has no access and she does not know what happened to those funds. Ron McHaney, her father, over the years sent her $4,000 for an automobile, $2,000 for a surgery, $1,000 towards the automobile deductible which was related to the collision she was in, and $2,000 for Jason's birth expenses.

Witnesses, such as Catherine Webster, Ron McHaney and the Tsonopouloses, testified that Dr. Tsarbopoulos was domineering and those observations, together with the evidence elicited from Kristi Tsarbopoulos regarding his verbal and physical abuse during the years persuade the Court that Dr. Tsarbopoulos was completely dominant in all essential matters affecting the couple and their family. Prior to marriage, Kristi Tsarbopoulos had been an energetic, socially active and optimistic person, but since her marriage she became increasingly isolated.

Dr. Tsarbopoulos became increasingly harsh in administering discipline to the children. Hari, in particular, was often disciplined because of his continuing difficulties with potty training. In February of 1997, Dr. Tsarbopoulos first learned that Kristi was pregnant with their third child. A short time prior to that Dr. Tsarbopoulos had been exploring a position with the Goulandris Museum. His former roommate, Dr. George Zaladis, was then on the Board of Directors for the Goulandris Museum. They had communicated regarding the position. When Dr. Zaladis was in New Jersey, he met with Dr. and Mrs. Tsarbopoulos to discuss Dr. Tsarbopoulos's interest in the possibility of the position. Testimony differs as to what occurred at that meeting, but it is clear to the Court that Dr. Zaladis wished to assure himself that if Dr. Tsarbopoulos was selected for the position, the couple would be willing to stay for a two-year period.

During this time, the news of this apparently unplanned pregnancy caused major issues for the couple. While Dr. Tsarbopoulos remembers that his first concern was the health of his wife because of some medical conditions that she had, she recalls only an ultrasound and disputes there were any other tests as he testified. Kristi Tsarbopoulos testified that Dr. Tsarbopoulos accused her of having an affair, encouraged an abortion, and upon learning of the news of the pregnancy, punched her in the stomach. The couple had considerable conflict over the pregnancy both because of the pregnancy itself and because of its impact on possible employment with The Goulandris Museum. Kristi Tsarbopoulos insisted on having the child. Ultimately her parents contributed $2,000 towards birth-related expenses of the child, Jason, who was born on July 28, 1997, because Dr. Tsarbopoulos did not want to pay any expenses involving Jason. By that time, Dr. Tsarbopoulos had accepted a position with the Goulandris Museum and had arranged for a move to Greece. The family arrived in Athens on September 30, 1997.

The news of the move to Greece came as a shock to both Kristi Tsarbopoulos' parents and to the couple's friends in the Greek–American community in New Jersey. It was only within a few weeks of the move that the Tsonopouloses learned of it. They thought the move was temporary, testifying that Dr. Tsarbopoulos was unsure about the move because he had expressed concerns about living in Greece and about the decreased level of compensation in Greece compared to the United States. They understood that Dr. Tsarbopoulos had obtained a leave of absence from Schering–Plough because he was uncertain about the future of the move to Greece. Dr. Tsarbopoulos visited the Tsonopouloses periodically during the two years following his move to Greece. They recall conversations with him in which he

stated that he was keeping his options open and was continuing to look at prospects for employment in Canada and the United States.

In preparation for the move to Greece, Dr. Tsarbopoulos went to the Greek consulate and sought a repatriation certificate. This could only be issued to a Greek Citizen, like himself, and not to Kristi Tsarbopoulos who had only United States citizenship. The issuance of the certificate enabled Dr. Tsarbopoulos to move his family's belongings to Greece without paying taxes upon arriving in Greece.

Because Jason was born on July 28, 1997, Dr. Tsarbopoulos was able to request and to receive family medical leave from his employer, Schering–Plough. Dr. Tsarbopoulos did not advise Schering–Plough that he had accepted a position at the Goulandris Museum. In fact, within a short time after seeking family medical leave, he moved his family to Greece to begin work with the Goulandris Museum, where he signed his first contract on October 1, 1997. Belinda Perichi, director of human resources for Schering–Plough, testified regarding Dr. Tsarbopoulos's request for family leave. The records of Schering–Plough demonstrated that he had requested parental leave beginning on September 29, 1997, through December 21, 1997 and was granted that leave. Dr. Tsarbopoulos then took vacation on December 22nd and 23rd 1997, and then short-term disability leave from January 1, 1998 through January 19, 1998. Dr. Tsarbopoulos, in filing his request for leave of absence, elected to continue his group insurance including his medical, dental, and life insurance coverage for which he paid during his leave of absence.

In a January 26, 1998, letter to Schering–Plough Dr. Tsarbopoulos resigned effective February 2, 1998, saying in part, "I now find it necessary to pursue more per-

sonally fulfilling endeavors back in Europe, where I will combine research and teaching. I hope to continue my contacts and collaboration with you and other members of the Mass Spectrometry Group, as well as other colleagues within SPRI." Correspondence from Schering–Plough in response to Dr. Tsarbopoulos's resignation was directed to him in Wayne, New Jersey. The records of Schering–Plough indicate that at the time he applied for family medical leave, Dr. Tsarbopoulos lived in Morristown, New Jersey. In February when he resigned, they indicated that he lived in Wayne, New Jersey. That change was possible only because of information that he provided to the company. This indicates that Dr. Tsarbopoulos not only failed to advise Schering–Plough of his whereabouts, but affirmatively misrepresented his address to his employer.

After the move to Greece, Dr. Tsarbopoulos maintained various financial arrangements with the United States. His Delta Air credit card and British Airways credit card maintained United States addresses, in order to qualify for mileage programs. He maintained a Citibank account to pay the Delta and British Airway credit card bills in order to obtain the mileage for flying back and forth from Greece to the United States. He maintained a New Jersey driver's license and received a New Jersey non-resident tax return. The address which Dr. Tsarbopoulos used for his British Airways account was in Colbert, Washington, the place to which Kristi Tsarbopoulos came with the children after leaving Greece in January of 2000.

On October 1, 1997, a contract was signed when Dr. Tsarbopoulos joined The Goulandris Museum. The contract terminated in 1999. On January 20, 1999, Dr.

Tsarbopoulos signed a new contract, defining the term as January 1, 1999 until December 31, 2001. That contract was modified by a new contract signed on September 29, 1999, which called for a term of indefinite duration. (Exhibit R, 221).[1]

While in Greece, the Tsarbopoulos family eventually moved into a three bedroom apartment. They had over $100,000.00 available to purchase a home. However, from the time of their arrival until the time of Kristi Tsarbopoulos's departure in January of 2000, the couple did not purchase a home. Their apartment in Greece had three bedrooms: one for Dr. Tsarbopoulos, one which was used as his study, and a third bedroom for the children. However, Jason slept on a cot in the livingroom while Kristi Tsarbopoulos slept on the bottom of a lower bunk bed in the children's room. Dr. Tsarbopoulos' study contained a stereo, computer, and leather chair, and was off limits to Kristi and the children. Many of the family's belongings and clothing had not been unpacked. Kristi Tsarbopoulos had little contact with Hari's school because Dr. Tsarbopoulos took charge of that task. On a daily basis, Kristi Tsarbopoulos was required to get his breakfast and eat it with him, then go downstairs to uncover his car. She received from him a daily list of tasks which he expected her to complete during the day. If the tasks were not completed, physical punishment would result. He called her several times a day and expected her to be home or to know exactly where she was at all times. If Dr. Tsarbopoulos could not locate Kristi, he would go into a frenzy.

Dr. Tsarbopoulos's extended family visited from time to time, and have a different perspective on the life of Kristi Tsar-

**1.** Exhibit 2 inaccurately states that Dr. Tsarbopoulos was hired on an indefinite term contract since October 1, 1997.

bopoulos and the children. Their view is of a more harmonious household than that described by Kristi Tsarbopoulos and other witnesses. They remember Kristi discussing business plans and a future summer home or bed and breakfast house in the Greek Islands. This is in sharp contrast to the testimony of Kristi Tsarbopoulos and other witnesses. The testimony of Kristi Tsarbopoulos is corroborated by Mr. and Mrs. Tsonopoulos in New Jersey, who continued to see Dr. Tsarbopoulos on his frequent trips to the United States during that two-year period, as well as the observations of Catherine Webster and her sister, Eva Webster, as well as the photographs of physical bruising arising out of the Christmas holiday incident in 1999.

From the perspective of Catherine Webster, a Greek national who befriended Kristi Tsarbopoulos, Kristi's life was socially isolated. Dr. Tsarbopoulos went to considerable length to assure himself where Kristi Tsarbopoulos would be on the rare occasions when she was not at the apartment. For example, Catherine Webster organized a dinner party for several women. Dr. Tsarbopoulos called Ms. Webster specifically to find out the details. As Catherine Webster testified, it was common when she called the Tsarbopoulos apartment to have Dr. Tsarbopoulos ask her a number of questions about the reasons for her call, before permitting her to speak to Kristi.

For the newborn, Jason, and the two year old Joanna, there was understandably no acclimatization to Greece. At their ages, their world revolved around their mother, their home, their brother, Hari, who was then attending kindergarten several hours a day, and their father, Dr. Tsarbopoulos, who was employed and at home in the evenings. In the apartment building itself, there were no children of an age which would make them playmates of the Tsarbopoulos children. Kristi Tsarbo-

poulos never ventured far from the apartment. She would only leave to shop or to occasionally take the children to a park. Kristi Tsarbopoulos had no car and did not use public transit. As Ms. Webster testified, Greek public transit was crowded and often had no seats available, making it virtually impossible for Mrs. Tsarbopoulos to travel with three young children. To Catherine Webster, Mrs. Tsarbopoulos appeared anxious and concerned that she would not be available to the call of Dr. Tsarbopoulos. This is consistent with the characterization of Dr. Tsarbopoulos by those who knew him in the United States as a domineering and controlling husband.

Kristi Tsarbopoulos had very limited fluency in Greek, Hari had little, if any, and the younger children had none. Hari was enrolled in Kindergarten and suffered the taunts of children that come with being a foreign child with poor language skills. This experience disturbed Hari. His occasional incontinence continued, causing embarrassment for Hari and concern from his parents.

During this time, Dr. Tsarbopoulos was extremely busy setting up an analytical laboratory at the Goulandris Museum and encountering the stress that accompanies such a project. His work at the Goulandris Museum included the responsibility to obtain continuing funding for future projects. Kristi Tsarbopoulos suffered an increase in the verbal and physical abuse at the hands of her husband during her time in Greece. An incident at Poros during a summer vacation with her parents exemplifies the situation. While there, the youngest child, Jason, took a tumble down a flight of stairs, which was of great concern to the entire family. Dr. Tsarbopoulos flew into a rage, accused Kristi of being at fault and began pushing her while screaming that he would kill her if anything happened to the child. Mr. McHa-

ney intervened. Dr. Tsarbopoulos entered the dwelling still yelling and threw an object out the door, shattering the object.

Dr. Tsarbopoulos's control over finances and all aspects of the family's life increased to an even greater degree during the time the family was in Greece. Kristi Tsarbopoulos had virtually no knowledge of the couple's finances, including their stock holdings. Additionally, publicly traded stocks in her name were sold but the documents involved in those transactions were obviously not signed by her although they bore her "signature." While she may have technically had access to some accounts and some money, she was unaware of the steps necessary to access those accounts. Financial records were kept in Dr. Tsarbopoulos' study, which Kristi was forbidden to enter.

Dr. Tsarbopoulos would occasionally study at home. He would become greatly agitated if the apartment was noisy during the time he was studying at home or during the time he was doing homework with Hari. He required Kristi Tsarbopoulos to check and recheck repeatedly to make sure the apartment was secure before they actually went to sleep.

As to the issue of physical abuse, Dr. Stephanede, a family practitioner in Greece, visited with the family on several occasions and did well-baby check-ups. While she had no office records, the doctor does not recall complaints of child or spousal abuse but does recall seeing Hari for his incontinence, and after she gave some advice, never heard of the problem again.

Despite any medical advice, the Court finds that Hari's "accidents" continued. While Kristi Tsarbopoulos may not have confided in Dr. Stephanede regarding child or spousal abuse, the Court finds that abuse of both kinds did occur. That finding is also based on the opinions of various experts, which the Court has accepted in the discussion of the Article 13(b) of the Hague Convention which follows. It is also based on the testimony of Eva Webster who took photographs which document the bruises to Kristi's thigh, arm, and right leg, (Exhibits 114–116), and of Catherine Webster who recalled Kristi limping which was later revealed to have been cause by her husband while in a temper having thrown an object on her foot.

This extremely difficult familial situation exploded in late December of 1999. Dr. Tsarbopoulos began to physically discipline Jason, the youngest child, picking him up by his hair and the seat of his pants and beating him with both of his hands. Dr. Tsarbopoulos was out of control and screaming that it was Kristi's fault. The child himself was also screaming. Kristi did not intervene because of fear that both she and Jason would be physically abused. However, shortly after that, Hari engaged in some childhood prank involving his sister's doll, which caused another explosion by Dr. Tsarbopoulos. She intervened because of his extreme reaction, pushing him away from the child; he forcefully shoved her into a bicycle causing her injury. He then beat Hari with the doll. That was the event which caused her to leave the apartment with the children. Dr. Tsarbopoulos denies screaming at Kristi that she should take Joanna and Jason and get out and leave Hari, but the testimony of the wife is more persuasive on this point. As a consequence, the Court believes that, in fact, in a rage, Dr. Tsarbopoulos did demand that Kristi take Joanna and Jason and leave Hari. When Kristi Tsarbopoulos left the apartment, she was understandably fearful that she and her children would continue to be subjected to verbal and physical injury by Dr. Tsarbopoulos.

## C. Analysis—Habitual Residence

Dr. Tsarbopoulos spent seventeen years in the United States. During this time, he

obtained his Ph.d., married Kristi Tsarbopoulos, a citizen of the United States, had three children with her, became a naturalized citizen of the United States, and enjoyed a successful ten-year career with Schering Plough. The Tsarbopoulos family spent some twenty-seven months in Greece before Kristi Tsarbopoulos returned to the United States with the three children.

From the time of their arrival in Greece, Joanna, age 2, and Jason, a newborn, were with their mother virtually all day every day, until their departure from Greece some 27 months later. There was very little socialization with anyone outside of the family. While Hari did attend school and begin learning the Greek language and therefore, experienced some acclimatization to Greece, it was insufficient to establish Greece as his habitual residence. From the evidence in this case the Court finds that the three children never acclimatized to Greece. Accordingly, Greece was not their habitual residence by virtue of acclimatization.

The Court next determines that the Tsarbopoulos' did not have a shared intent to abandon the United States as the habitual residence of the children and to make Greece the habitual residence of the family. This finding is based on the evidence in the case and on the tone, manner and demeanor of the witnesses in this case. The Court finds that Dr. Tsarbopoulos so dominated decisions and controlled information in the marriage that Kristi Tsarbopoulos lacked information regarding his true employment relationship with Schering Plough and with the Goulandris Museum. Thus, to the extent that he may have intended to have Greece become their habitual residence, this intent was not shared with Kristi, and was in fact, concealed from his wife. Until receiving his resignation letter in January of 1998, some four months after he actually arrived in Greece

and signed an employment contract with the Goulandris Museum, Schering Plough's file indicated that Dr. Tsarbopoulos lived in New Jersey and continued in its employment. It is understandable, then, that Kristi Tsarbopoulos and other witnesses in the United States believed that he was only on leave of absence from Schering-Plough.

Further, no objective evidence contradicted the notion that the move to Greece was only for a sabbatical. For example, Dr. Tsarbopoulos originally signed a contract for a 2-year term with the museum, continued to communicate with Schering-Plough while in Greece, visited Schering-Plough when traveling in the United States, indicated to the Tsonopouloses and to his father-in-law that he was continually looking at employment opportunities in the United States, maintained charge cards and airline mileage plan accounts with a New Jersey address, and maintained a New Jersey driver's license. While Dr. Tsarbopoulos points to a note from his wife in 1995 alluding to a "dream of living in Greece," to the fact that they took all of their clothes and belongings to Greece, and that repatriation had been granted to him, that evidence does not prove that Kristi shared his intent to make Greece the habitual residence of the family.

Dr. Tsarbopoulos undoubtedly understood the effect of repatriation as it certainly only applied to him as a Greek citizen and did enable him to bring goods to Greece without paying taxes on those goods when arriving in Greece, a benefit which seems equally consistent with the concept of frugality as it does with the concept of habitual residence. As to notes between husbands and wives about some future possibility, the content may be indicative of wishful thinking, of a true state of mind, or of an effort to placate the recipient, as well as other possibilities.

The reasons for such notes may never be disclosed and their contents are but one factor when it comes to measuring the state of mind of the two individuals two years later. In fact, during this hearing, when cross-examined about this note, Kristi Tsarbopoulos testified that the "dream" referred to the possibility of owning a summer place in the Greek Islands and the Court found that testimony credible when observing her; it is also consistent with their vacation pattern both while in the United States and in Greece. Having carefully observed both parties while testifying and comparing the testimony of each to the other and to the other witnesses and the documentary evidence, the Court is persuaded that this couple did not share an intent to make Greece the habitual residence of the Tsarbopoulos family.

As to whether while in Greece, Kristi Tsarbopoulos became acclimatized to Greece, the testimony establishes unequivocally that she did not acclimatize to Greece. The verbal and physical abuse by Dr. Tsarbopoulos intensified during the twenty-seven months spent in Greece, as did her isolation. This mother of two preschool children and a four and a half year old son had obligations which often confined her to the home for extended periods. Added to these obligations were the demands of a domineering husband to complete daily tasks, location in a country whose language she barely speaks, and very limited social contacts as the testimony indicated. The Court finds the result is that Kristi Tsarbopoulos did not acclimatize to Greece. As a consequence, she cannot be said to have made Greece the habitual residence of her children or to have joined Dr. Tsarbopoulos in his intent to do so.

The private interaction of a married couple may surprise and shock family and friends when compared to their public displays. On the contrary, the domination of Dr. Tsarbopoulos in the couple's marriage was well known. His control of all major decisions of the couple was known. Verbal abuse and physical abuse endured by Kristi Tsarbopoulos was evident on several public occasions, but not to the degree that it occurred in private. The verbal and physical abuse of one spouse by the other is one of several factors in the Court's determination of the existence of "shared intent" to make a place the family's "habitual residence." [2] If this conduct is present in the marriage, then it must be considered by the trial court in taking "into account 'all of the circumstances of any particular case.'" *Mozes v. Mozes,* 239 F.3d 1067, 1080 (9th Cir.2001).

Where the Court finds verbal and physical abuse of a spouse of the kind and degree present in this case, the conduct of the victimized spouse asserted to manifest "consent" must be carefully scrutinized. Here, the Court listened carefully to the testimony of Dr. Tsarbopoulos on the issue of his verbal and physical abuse of his wife. What he said and did not say, as well as his manner while testifying on those issues persuades the Court that he is not credible on those issues. The Court finds verbal and physical abuse of Kristi Tsarbopoulos did occur. This abuse, considered along with (1) Dr. Tsarbopoulos' control of the major decisions and finances of the family, (2) other evidence of continued ties to the United States (3) the finding that he deceived Schering–Plough in 1997 on the status of his employment with it and (4) the finding that, despite his denial, he did sign his wife's name to several stock transac-

---

**2.** *See Ponath v. Ponath,* 829 F.Supp. 363, 368 (D.Utah 1993) ("Petitioner's coercion of respondent by means of verbal, emotional and physical abuse removed any element of choice and settled purpose which earlier may have been present in the family's decision to visit Germany.")

tions, supports the testimony of Kristi Tsarbopoulos that she did not intend Greece to be the habitual residence of the family. Based on the weight of this evidence, the Court finds that Greece was not the habitual residence of the Tsarbopoulos children and that the United States continues to be their habitual residence.[3]

Because this determination is dispositive, the Court need not answer the remaining two *Mozes* questions because they would only be material if the Court found that Greece was the habitual residence of the children. However, it is undisputed that Dr. Tsarbopoulos was exercising such custody rights as he may have had under Greek law at the time his wife returned to the United States with the children. Additionally, the Court need not address these two *Mozes* questions given its alternative decision on the applicability of the Article 13(b) of the Hague Convention, which follows, because it assumes arguendo that Greece is the habitual residence of the children.

### D. Conclusions of Law—Application of the Hague Convention

■ The Court concludes as a matter of law that the Hague Convention does not apply because the parents did not share a settled intent to change the family's habitual residence from the United States to Greece. Therefore, Mrs. Tsarbopoulos did not remove the children from their habitual residence, so the removal was not actionable in a Petition for Return under the Hague Convention. Accordingly, the Petition is DENIED.

**3.** Whether the law of the state of New Jersey or the state of Washington applies may be an issue that will have determined by the Washington state court where the dissolution of marriage action has been filed.

### III. ARTICLE 13(b)

In the alternative, if the Hague Convention were to apply, where there is clear and convincing evidence that a return to the "habitual residence" would pose a grave risk of harm to the children, the Hague Convention's Article 13(b) provides an exception to the requirement that a court order the return of the children.

### A. Law—Article 13(b) Defense

In pertinent part, Article 13(b) states:

Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that...

.    .    .    .    .

(b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Hague Convention, art. 13, 19 I.L.M. at 1502.

Speaking in part of Article 13(b), Pérez–Vera says, "[t]hus, the interest of the child in not being removed from its stability in the new environment gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation." Pérez–Vera Report at ¶ 29, p. 433.[4]

■ Spousal abuse, found by the Court in this case, is a factor to be considered in

**4.** For an extensive survey and discussion of Article 13 cases, see Chapter 9, "The Protection of Children Where a Return May Result in Harm: Article 13(1)(b), Undertakings, and Article 20," The Hague Convention on International Child Abduction, Beaumont and McEleavy.

the determination of whether or not the Article 13(b) exception applies because of the potential that the abuser will also abuse the child.

In *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir.2000), the Court found that the evidence established that the Article 13(b) exception applied and that the behavior of the petitioner was such that no undertakings were sufficient to eliminate the grave risk faced by the children if returned. In *Walsh*, unlike the present case, the respondent conceded that the country from which the children were removed was their "habitual residence" and that her removal of them had been wrongful. In reversing the ruling of the district court that the Article 13(b) exception did not apply, the First Circuit ruled, *inter alia*, that the exposure of the children to a spousal abuser would expose the children to the risk of abuse saying,

> Fourth, credible social science literature establishes that serial spousal abusers are also likely to be child abusers.... Fifth, both state and federal law have recognized that children are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser.... These factors are sufficient to make a threshold showing of exposure to physical or psychological harm.

*Id.* at 220 (citations omitted).

When both spousal and child abuse have been found by the Court, the Court must consider the effect of both forms of abuse on the children in determining whether the Article 13(b) exception applies. Additionally, consideration must be given to the child's reaction to the prospect of return when there has been pre-removal abuse.

In *Re F. (A Minor) (Abduction: Custody Rights Abroad)* [1995] Fam. 225, as reported in Beaumont and McEleavy at 150, the Court ruled that Article 13(b) applied and the child would not be re-

turned because of the child's physical reaction to the possibility of being returned. The father was alleged to have engaged in intimidation and random acts of violence witnessed by and directed at the boy.

> The effect on the boy, aged only four, was severe and included aggressive behavior, bedwetting, and nightmares. Butler–Sloss LJ reported that this ceased upon moving to the maternal grandparents' home in Wales. However, she noted that, when informed he may have to return to Colorado, identical behaviour recommenced.

> Butler–Sloss LJ held that the high standard required under Article 13(1)(b) had been met, although this was not as a result of the behaviour of the father in itself but because of the child's reaction to the return.

*Id.* at 151. Butler and McEleavy believed that decision was correct because it was based on conduct of the child which could not be coached and was "a natural, deep-felt reaction against pre-abduction situation." *Id.* at 151.

Where the facts demonstrate pre-removal abuse and the evidence, including expert opinion, establishes a grave risk of physical or psychological harm, courts have applied the Article 13(b) exception. In *Blondin v. Dubois*, 238 F.3d 153 (2nd Cir.2000), the appellate court upheld the application of the Article 13(b) exception by the district court which concluded "that a likelihood of post-traumatic stress disorder constitutes a 'grave risk of psychological harm' within the meaning of Article 13(b)." *Id.* at 158. Based on the uncontroverted expert opinion and other testimony, the court found that the children had suffered a stress disorder as a result of their father's physically and emotionally abusive treatment in France, which would recur if the court ordered their return to France. The Second Circuit also approved the dis-

trict court's consideration of evidence that the children were settled in their new environment as one of factors considered in its analysis of the Article 13(b) exception. *Id.* at 164, 165.

■ The parties correctly agree that the burden is on the Respondent Kristi Tsarbopoulos to prove by clear and convincing evidence that the Article 13(b) exception applies. The portion of ICARA governing burdens of proof states:

(2) In the case of an action for the return of a child, a respondent who opposes the return of the child has the burden of establishing—

(A) by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies;

42 U.S.C. 11603(e)(2)(A).

### B. Facts—Article 13(b) Defense

The Court must determine if the evidence establishes the past physical and verbal abuse of the children, if they have experienced stress disorder, and if a return to Greece would cause them "a grave risk of physical or psychological harm or otherwise put them in an intolerable situation." A final factor which the Court must consider is the degree to which the children have become settled in the home of their maternal grandparents where they and their mother have resided since their return in January of 2000.

Undisputed testimony establishes that the youngest child, Jason, has suffered night tremors since birth, and seldom, if ever, has slept through the night. Age two and a half at the time of his return to the United States, he is now four years old. From birth, he has been in the care of his mother and has not been out of her presence for any significant period of time.

Since returning to the United States, he has progressed to the point where he is now sleeping through the night.

Joanna, age four when she returned to the United States, will be six soon. The Court found credible and reliable the testimony of Carol Thomas, child therapist, and Linda Indiveri, Joanna's pre-kindergarten teacher, that Joanna has suffered sexual abuse which she associates with the father. Beginning in February, 2000, Carol Thomas, a child therapist, evaluated and treated Joanna who was then four years and three months. Joanna was referred to her by Dr. Debra Brown, a clinical psychologist who interviewed, tested, and evaluated the children and Kristi Tsarbopoulos shortly after their return to the United States. During her sessions with Carol Thomas, Joanna graphically described sexual abuse which she, Joanna, associated with her father. Carol Thomas opined that Joanna had been physically and sexually abused and associated this abuse with her father but had made excellent progress in therapy. Ms. Thomas obviously did not observe the actual conduct that Joanna attributes to her father, hence she uses the term "associated with" when the child attributes the acts to a person and the child is credible. Finally, she testified that returning the child to Greece would be detrimental to her health and that she would regress noting that after visits with father, Joanna engaged in sexual acting out. The Court accepts this opinion.[5]

Dr. Tsarbopoulos vehemently denied such conduct or even the thought of such conduct. No medical testimony was offered which confirmed physical evidence of sexual abuse. However, no expert offered an opinion contradicting the opinion of

---

**5.** Sexual abuse of a child by a parent is an "intolerable situation" under Article 13(b). *Blondin v. Dubois,* 238 F.3d 153, 162 (2nd Cir.2001) (quoting from the United States Department of State's analysis of Article 13(b), 51 F.R. § 10510).

Carol Thomas, an expert in diagnosing and treating sexual abuse in children. There is also no evidence that Joanna's spontaneous statements regarding sexual abuse or her descriptions of the sexual abuse to Carol Thomas were "coached." To the contrary, Ms. Thomas stated that there was no evidence of "coaching."

Ms. Indiveri, Joanna's teacher, observed and reported statements and conduct of Joanna which were consistent with sexual abuse: masturbation, nightmares during nap times and bedwetting. On one occasion, upon awakening, the child spontaneously described abuse by her father. After some time had passed with decreased behavioral symptoms, Ms. Indiveri observed a recurrence of symptoms such as bedwetting and nightmares following visits by the father.

While Kristi Tsarbopoulos had observed Joanna masturbating on one occasion before going to Greece, she never reported the behavior to anyone and had not made allegations of sexual abuse before the diagnosis was made. When first counseled by Dr. Brown immediately upon return to the United States, sexual abuse behavior and comments by Joanna led her to refer Joanna to Carol Thomas who diagnosed it.

Hari, age seven at the time he returned to the United States, and now age nine, was also referred for counseling by Dr. Debra Brown. Sue Elg, a licensed child mental health therapist, saw Hari for four sessions beginning February 11th, 2000. Based on Hari's reports including some spontaneous exclamations, during these sessions which she described during her testimony, she concluded that he had been subjected to significant physical and emotional abuse which he associated with his father.

In March of 2000, Hari began treatment with Dr. Clay Jorgensen, a clinical psychologist for more than thirty years, who diagnosed post traumatic stress disorder in him and in the other children. Hari no longer has any embarrassing accidents and has made progress in controlling his temper and behavior at school. Dr. Jorgensen saw Hari primarily as Joanna was being seen by another therapist. He concluded that Hari had experienced domestic abuse and had been subjected to physical abuse by his father. He diagnosed "stress disorder" in Hari based on his sessions with him and on the history of symptoms reported by Kristi Tsarbopoulos. By June of 2000, Hari had improved and as of March, 2001, he was to return on an "as needed" basis. However, Dr. Jorgesen opined that separating him from his mother by returning him to Greece either with or without his siblings would be detrimental to his health.

Elizabeth Pfiffner, who has degrees in psychology and social work, is a social worker in the Mead School District who works with children from kindergarten through grade six. When Hari entered school upon arriving in the state of Washington, she worked with Hari at his school because of his aggressive and argumentative behavior. After a four-day suspension for fighting in May of 2000, he was put in a social skills class to learn how to interact with other children and authority figures. By the fall of 2000, he was improved and continues to do well.

Dr. Mays, a psychologist called by the Dr. Tsarbopoulos, examined the children. He reported that Hari complained of his father hitting both him and his mother. Dr. Mays believed that it was likely that Hari was hit excessively by his father, that it was disruptive to Hari beyond the norm and that Hari was not rehearsed in these statements about the hitting. He also found that the three children were bonded to one another, opined that Hari was now better psychologically than he had been, and that therapists Elg and Thomas were

credible. Dr. Mays does not disagree with Dr. Jorgensen's opinion of post-traumatic stress disorder ("PTSD") in the past, but at the time of his exam, he did not see evidence of PTSD and does not believe that the children face a grave risk of harm if returned. He does say that progressive reintegration is the most elegant way of handling the situation. He had not been asked to and did not evaluate Dr. Tsarbopoulos.

## C. Analysis—Section 13(b) Defense

■ The Court finds clear and convincing evidence that there is a grave risk of physical and psychological harm to the children were the Court to order their return to Greece. The evidence of physical and emotional abuse of the children is persuasive to the Court. Jason at age four, Joanna at age six and Hari at age nine are bonded as siblings. Exhibit 166, a compilation of photographs, documents their participation in home, school, and social activities since their arrival in January, 2000. They are well settled in the community where they have been living with their mother since that time. Contact by Hari and Joanna with their father causes some recurrence of their symptoms such as nightmares and bedwetting.

There are some resources in Greece for children who need the protection of the Greek justice system. However, if these children were returned to Greece, their diagnosed symptoms of stress disorder will return. This is particularly true for Joanna. As for Jason, not only is he bonded with his two siblings, his mother has been his primary care giver for virtually all of his four years. Separating him or Hari or Joanna from each other or from their mother would be an intolerable situation. Kristi Tsarbopoulos has no resources which would enable her to live in Greece; she lacks language skills, would be quite likely unemployable, has no place to live and there is no evidence that there are

government benefit programs which would supply financial or other support for her as a spouse who has been subject to spousal abuse. Additionally, Dr. Tsarbopoulos has provided no financial support to Kristi Tsarbopoulos or the children since they left Greece which added to their dependence on her family and their integration into that home and community. Finally, there was no evidence of undertakings, offers of support in Greece, or other services available to ensure the safety of the children if they were returned to Greece.

These findings are made in the context of this petition and response under the Hague Convention only. The Court is cognizant that there may be an effort to use these findings in a state court action for dissolution of marriage where custody will be litigated. However, the judge who presides in that action will consider different legal issues with different burdens and standards of proof. The findings regarding the factual basis for application of Article 13(b) are made only in the alternative in order to permit full and efficient review if and when this case is appealed.

## D. Conclusions of Law

Given these findings of fact, this Court finds that there is clear and convincing evidence that the three children would face a grave risk of physical and psychological harm if they were removed to Greece, that they are settled in the state of Washington, that it would be intolerable to require the children to be removed from the presence of their mother or to return Hari while leaving Joanna and Jason here in the United States, and that there are no undertakings which would eliminate this grave risk or intolerable situation. Consequently, even assuming *arguendo* that Greece were the habitual residence of the children prior to Mrs. Tsarbopoulos' return to the United States in January of

2000, this Court would deny the Petition for Return of the children based on Article 13(b) of the Hague Convention.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Mrs. Tsarbopoulos' return to the United States from Greece with the Tsarbopoulos children is not actionable under the Hague Convention. There was no shared intent to abandon the family's habitual residence of the United States, and no acclimatization in Greece, and so the children did not become habitually resident in Greece prior to their removal. The Petitioner therefore is not entitled to relief under the Hague Convention. The Court, in the alternative, concludes as a matter of law that the exception found in Article 13(b) of the Hague Convention applies here, and there is no evidence of undertakings which would ensure the safety of the children, were they returned to Greece. Thus, even if Greece were the habitual residence of the children, and this Court would deny the return of the children as posing a grave risk of physical or psychological harm. The Petition for Return of Children under the Hague Convention is DENIED.

Accordingly,

**IT IS HEREBY ORDERED.** The District Court Executive is directed to:

(1) Enter this Order;

(2) Provide copies to counsel; and

(3) **Close the file.**