# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

—————

No. 02-2496

—————

Robert Hechter Silverman,            *
                                           *

          Appellant,           *

                                          *   Appeal from the United States

      v.                           *   District Court for the

                                          *   District of Minnesota.

Julie Hechter Silverman,            *

                                            *

          Appellee.           *

—————

Submitted: April 16, 2003

Filed:  August 5, 2003

—————

Before LOKEN, Chief Judge, HEANEY, McMILLIAN, BOWMAN, WOLLMAN, BEAM, MORRIS SHEPPARD ARNOLD, MURPHY, BYE, RILEY, MELLOY, SMITH, Circuit Judges.[1]

—————

BEAM, Circuit Judge, with whom LOKEN, Chief Judge, BOWMAN, WOLLMAN, MORRIS SHEPPARD ARNOLD, RILEY and SMITH, Circuit Judges, join.

---

[1]Circuit Judges Murphy and McMillian were not present at oral arguments and participated in this decision utilizing the parties' briefs and a tape recording of the oral arguments.  Circuit Judge Heaney participated via telephone.

Robert Silverman (Robert) appeals the district court's rulings on his claim under the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention), 19 I.L.M. 1501 (1980), as implemented by the United States in the International Child Abduction Remedies Act, 42 U.S.C. § 11601-11610 (ICARA). Because we find that the children's habitual residence was Israel at the time of their removal and that there is no grave risk of harm to the children if they are returned to Israel, we reverse the district court.

## I.     BACKGROUND

According to the facts found by the district court, Robert Silverman and Julie Hechter (Julie) met in Israel in 1988 and married in Seattle, Washington, in 1989. They moved throughout the United States and had two children, Sam and Jacob.[2] The family lived in Plymouth, Minnesota, until their move to Israel in late July of 1999.[3] Both Robert and Julie testified in the district court that the move to Israel was Julie's idea and that she was the one pushing for the family to make the move. They sold their Minnesota home in January of 1999, Robert applied for and made Aliyah (immigration) to Israel,[4] and the family moved all of their possessions and their family pets to Israel. While both Robert and Julie set the move up to be permanent, Julie stated in the district court that she was torn about the move, but went ahead with it as a final effort to reconcile the couple's failing marriage.[5]

---

[2]Sam was born on March 2, 1992, and Jacob was born on July 5, 1995.

[3]In the months leading up to the move, Robert worked and lived in Wisconsin, while Julie and the children remained in Minnesota.

[4]Julie had already made Aliyah in 1987.

[5]Julie testified that she was "torn," not because she did not want to go to Israel, but because she was not sure she wanted to stay in her marriage.

Both Robert and Julie obtained employment in Israel. The family lived with relatives in Israel until November 1999, when they rented an apartment and signed a one-year lease. In October 1999, Julie flew to the United States to file for bankruptcy in Minnesota. Julie returned to Israel later that month to discover that Robert had obtained a Tzav Ikuv (restraining order), which prevented her from leaving Israel, and that he had put the children's passports and birth certificates in his father's safe deposit box. Robert told her at this point that he knew about the affair she had been having with a man from Massachusetts. Robert cancelled the restraining order on November 3, 1999, after they decided to try to reconcile their marriage. Robert testified in the district court that he would not have allowed Julie to leave Israel *with the children* at any point between October 1999 and June 2000. During this time, Julie stated that Robert threatened her, used force against her and attempted to coerce her.[6] In January 2000, Julie and Robert returned to Minnesota without the children to complete bankruptcy proceedings and they both stated, under oath, that their permanent address was Plymouth, Minnesota. Both of them subsequently returned to Israel. In April 2000, Robert and Julie signed and filed a joint United States income tax form for 1999, which listed their address as Plymouth, Minnesota.

While in Israel, Sam enrolled in an elementary school and Jacob enrolled in preschool. They made friends, learned to speak Hebrew and did well in school. Sam participated in extracurricular activities at his school. During this time, Julie counseled with an Israeli attorney and was told she would probably not get custody of the children through the Israeli Rabbinical court if she separated from Robert in

---

[6]The district court did not find, and Julie does not allege, that Robert committed any violence against the children. While we do not find it necessary to overturn the factual finding by the district court that there was physical violence against Julie by Robert, we do find it prudent to note that Julie also engaged in physical violence towards Robert.

Israel.[7] Robert found out about this discussion and filed for divorce in Rabbinical court. He later cancelled this proceeding.

At the end of June 2000, Robert allowed Julie to leave Israel with the two children for what she represented would be a summer trip to the United States. She purchased round-trip tickets with the return trip scheduled for August 30, 2000. At the airport before their departure, Robert threatened Julie, apparently because of his continuing concern that she would not return to Israel with the children, a fear soon realized. She testified that it was at that moment at the airport that she decided not to return to Israel. Julie filed for legal separation from Robert and for custody of the two children in Minnesota state court on August 10, 2000. Robert was served summons in Israel. Robert immediately moved for dismissal of the action, arguing that the state court lacked authority to hear the custody issues because there had not yet been the necessary determinations of "wrongful removal and retention" and "habitual residence" as mandated by the Hague Convention and ICARA, determinations designed to establish whether Israel or the United States had jurisdiction to hear a child custody case.[8]

The record reveals that on August 24, 2000, fourteen days after Julie's Minnesota action had been commenced, Robert filed in Israel a "Request for Return of Abducted Children" with the National Center for Missing and Exploited Children (NCMEC), pursuant to the Hague Convention. On September 22, 2000, a NCMEC

[7]Apparently the attorney thought Julie would have a better chance in Israel civil court. Whether this was because of Julie's continuing adulterous relationship with the man from Massachusetts or for other unrelated reasons is not clear from the record.

[8]Article 16 of the Hague Convention provides that proceedings in an abducted-to nation, here the United States, may not determine custody issues. Hague Convention Article 16; 42 U.S.C. § 11601(b)(4); March v. Levine, 249 F.3d 462, 468 (6th Cir. 2001). The Convention imposes and requires a *preliminary* determination of which country has jurisdiction to consider custody questions.

-4-

agent contacted Robert's Israeli attorney and requested that the attorney obtain a determination from the Israeli courts as to whether Julie had wrongfully removed or retained the children within the meaning of the Hague Convention. Some time shortly thereafter, Robert filed a Hague Convention petition in Israel seeking such a determination. In addition to filing the Israeli action, Robert filed a Hague petition on October 5, 2000, in the United States District Court for the District of Minnesota seeking return of the children to Israel under the Convention. Julie was personally served summons in this matter on October 10, 2000.[9] This filing and service preceded any determinations in the state custody matter. Indeed, it preceded the final order of the Minnesota trial court by almost seven months.

On October 17, 2000, although on notice of Robert's Hague filings,[10] a state court referee issued an interlocutory administrative order granting Julie temporary custody of the children. Armed with this temporary order, Julie testified that in February 2001 she decided to move with the two children to Massachusetts to live with her paramour. They subsequently moved.

Within a month after the October 17, 2000, temporary order, upon the request of Julie, the district court dismissed the federal Hague claims on abstention grounds, Silverman v. Silverman, No. 00-2274 (D. Minn. Nov. 13, 2000), but we reversed and remanded the case for an evidentiary hearing, finding that abstention does not apply in Hague Convention cases. Silverman v. Silverman, 267 F.3d 788, 792 (8th Cir. 2001). On November 16, 2000, while both the state custody and federal Hague matters were pending in various courts in the United States, the Israeli court ruled that

---

[9]Julie was served the day of the state court hearing.

[10]"A court may get notice of a wrongful removal or retention in some manner other than the filing of a petition for return, for instance . . . from the aggrieved party (either directly or through counsel) . . . ." 51 Fed. Reg. 10494(III)(H) (Mar. 26, 1986).

Israel was the place of habitual residence of Sam and Jacob as defined in the Convention and that Julie's failure to return them to Israel was prima facie evidence of wrongful retention of the children in violation of the Convention.[11] A copy of this decision was furnished to the Israel Central Authority created by Articles 6 and 7 of the Hague Convention for use in the United States under the terms of Article 15 of the Convention.[12] On May 4, 2001, the Minnesota trial court entered a final judgment awarding full child custody to Julie, child support from Robert and attorney fees to Julie. While this order specifically stated that the court was on notice of pending

---

[11]Although this determination was apparently made without her presence, Julie and her American attorney had been given notice of the Israeli petition and hearing but she decided not to attend. On December 21, 2000, Julie retained a lawyer in Israel and requested that the court reverse its November 16 decision. The Israeli judge agreed to hold a second hearing. Julie was also notified of this hearing, but was advised by her attorney not to attend. On October 30, 2001, the Israeli court refused to reverse its November 16, 2000, holding that Israel was the habitual residence of the children and that Julie had wrongfully removed them in violation of the Hague Convention.

[12]The Hague Convention provides that "[a] Contracting State shall designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities." Art. 6. The Central Authorities of each Contracting State must cooperate with each other and with the competent authorities in their respective states to secure the prompt return of abducted children. In particular, the Central Authority shall take all appropriate measures,

> (a) to discover the whereabouts of a child who has been wrongfully removed or retained;
> . . .
> (i) to keep each other informed with respect to the operation of this Convention and, as far as possible, to eliminate any obstacles to its application.

See Hague Convention, Article 7. See also 22 C.F.R. § 94.6.

Egervary v. Young, 159 F. Supp. 2d 132, 138-39 (E.D. Pa. 2001).

Hague Convention litigation, the court decided the custody issues anyway, applying only Minnesota law. The state court determined neither the "habitual residence" of the children nor the issue of "wrongful removal or retention" as required by and defined in the Hague Convention and ICARA. Indeed, it was not asked to do so. The court, in awarding Julie custody and child support, found that Minnesota was the children's "home state" as referenced in Minnesota Statutes § 518D.102. In section 518D.102(h), "home state" is defined as "the state in which a child lived with a parent . . . for at least six consecutive months immediately before the commencement of a child custody proceeding. . . . A period of temporary absence . . . is part of the period." But, "state" is defined in the statute and includes only the fifty states, District of Columbia, Puerto Rico, Virgin Islands, and other United States territories and possessions. Thus, a determination of "home state" under the Minnesota statute is clearly not equivalent to a determination of "habitual residence" under the Hague Convention because under the Minnesota act, Israel could not have been determined to be the "home state" of the children.

No appeal was taken from the May 4, 2001, judgment but after the October 17, 2000, interlocutory order, Robert, on October 27, 2000, sought a writ of prohibition from the Minnesota Court of Appeals to restrain the implementation of the temporary ruling. Before this request was heard, however, the federal district court entered its abstention and dismissal order of November 13, 2000, an order later reversed by this court, as earlier noted. Without reviewing the Minnesota trial court order on the merits or considering any issues of federal law, including Hague Convention issues, the Minnesota Court of Appeals, using the federal court dismissal as a basis, denied the application for writ of prohibition as moot, indicating specifically that Robert was free to file a Hague petition in Hennepin County (Minnesota) Court. Silverman v. Silverman, Order C2-00-1879 (Minn. Ct. App., Nov. 21, 2000). So, to date, neither Robert nor Julie has ever requested any Minnesota court to make any Hague Convention or ICARA determinations and no such determinations have been made by any state tribunal.

-7-

On May 9, 2002, the federal district court ruled in favor of Julie on Robert's Hague Convention claim, finding that Minnesota was the "habitual residence" of the children[13] and, alternatively, that even if Israel was their habitual residence, that there was a grave risk in returning the children to Israel under the Article 13(b) exception to the Convention. Silverman v. Silverman, No. 00-2274, 2002 WL 971808 (D. Minn. May 9, 2002). Robert appeals this decision.

## II. DISCUSSION

### A. Rooker-Feldman Doctrine

At the outset, we address the relevance and applicability of the Rooker-Feldman doctrine to the claims in this case, an issue not raised by either party but by the court itself at oral argument, and now advanced for the first time by Julie in this appeal. More specifically, the Rooker-Feldman question is whether the state court judgment of May 4, 2001, divested the lower federal courts of subject matter jurisdiction to consider and review the Hague Convention and ICARA controversies raised by Robert in the federal district court. We find the doctrine inapplicable.

The Rooker-Feldman doctrine holds that the inferior federal courts lack jurisdiction to review a state court's final judicial determination. District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 476 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413, 416 (1923). "Under the legislation of Congress, no court of the United States other than [the Supreme] court [can] entertain a proceeding to reverse or

---

[13]The court found that the habitual residence of the children had never changed to Israel, but remained in Minnesota the entire time. The law is clear that wrongful removal from a country does not change a child's Hague Convention habitual residence. Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995). Therefore, if the children's habitual residence changed when they moved to Israel, it did not change back when Julie removed them back to Minnesota.

modify the [state court] judgment . . . ." Rooker, 263 U.S. at 416; see 28 U.S.C. § 1257. However, applying such a simply stated rule has proven to be both complex and difficult. This is because the doctrine, in practice, has become a fluid mix of appellate subject matter jurisdiction, claim and issue preclusion, and, perhaps, abstention concepts. It has been extended not only to straightforward review of state court judgments, but also to "indirect attempts by federal plaintiffs to undermine state court decisions." Lemonds v. St. Louis County, 222 F.3d 488, 492 (8th Cir. 2000). In determining whether Rooker-Feldman applies in a particular case, a federal court must determine whether the claim before it is "inextricably intertwined" with the claim already decided in the state court. Id. at 492-93. "A claim brought in federal court is inextricably intertwined with a state court judgment 'if the federal claim succeeds only to the extent that the state court wrongly decided the issue before it.'" Ballinger v. Culotta, 322 F.3d 546, 549 (8th Cir. 2003), (quoting Lemonds, 222 F.3d at 493.) "Where the district court must hold that the state court was wrong in order to find in favor of the plaintiff, the issues . . . are inextricably intertwined." Doe & Assocs. Law Offices v. Napolitano, 252 F.3d 1026, 1030 (9th Cir. 2001).

According to several commentators, Rooker-Feldman analysis is influenced, in part, by the supremacy clause, full faith and credit concepts and congressional concerns for comity with and respect for the rights of the sovereign states. See U.S. Const. art. VI, § 1, cl. 2 & art. IV, § 1. The subject matter jurisdiction of the "inferior courts" of the United States is assigned through and limited by acts of Congress. Id. at art. III, §§ 1 & 2. Acting upon this Constitutional power,

> the policy of the successive acts of Congress regulating the jurisdiction of federal courts is one calling for [] strict construction . . . . Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits . . . the statute has defined.

Breuer v. Jim's Concrete of Brevard, Inc., 123 S. Ct. 1882, 1886 (2003) (some alterations in original) (internal quotations omitted). Rooker and Feldman noted that Congress, in applying this policy, has limited federal subject matter jurisdiction over issues of direct review of state court decisions to the Supreme Court. Rooker, 263 U.S. at 416 (citing Judicial Code, § 237, as amended September 6, 1916); Feldman, 460 U.S. at 464 (citing 28 U.S.C. § 1257). This does not mean, and the Rooker-Feldman decisions do not hold, that Congress has prohibited federal appellate courts from reviewing matters decided by federal district courts under specific grants of original jurisdiction, even when concurrent grants of original jurisdiction lie with both the state and federal courts in particular situations. See 28 U.S.C. § 1291.

Congress adopted the Hague Convention, an international treaty, making it, under the Constitution, part of "the supreme Law of the Land." U.S. Const. art. VI, § 1, cl. 2; Asakura v. City of Seattle, 265 U.S. 332, 341 (1924). Congress then implemented the Hague treaty by enactment of ICARA. While ICARA grants original concurrent jurisdiction *of actions arising under the Convention* to the courts of the states and the United States, 42 U.S.C. § 11603(a), several restrictions in the treaty and ICARA guide these grants of jurisdiction in both sovereigns' courts. First, full faith and credit shall be accorded a prior judgment in either state or federal court, but only if the judgment arises through adjudication of a Hague Convention claim in accordance with the dictates of the Convention and ICARA. 42 U.S.C. § 11603(g); see, e.g., Holder v. Holder, 305 F.3d 854, 864 (9th Cir. 2002). As earlier noted, neither Robert nor Julie has ever requested any Minnesota court to make Hague Convention or ICARA determinations, and no state court has done so. Thus, the May 4, 2001, order of the Minnesota court is not entitled to full faith and credit under section 11603(g), and the Rooker-Feldman doctrine does not override federal statutory grants of original jurisdiction under ICARA or this court's appellate jurisdiction under section 1291.

In Holder, the Ninth Circuit addressed this issue in only a slightly different context. No ICARA action was *pending* when a California state court rendered a child custody determination, arguably, according to the state court plaintiff, eliminating the need for a Hague proceeding. The Ninth Circuit disagreed, noting correctly that "[i]t would [] undermine the very scheme created by the Hague Convention and ICARA to hold that a Hague Convention claim is barred [in federal district court] by a state court *custody* determination." 305 F.3d at 865 (emphasis in original). Indeed, Article 16 of the Convention states,

> [a]fter receiving notice of a wrongful removal . . . the judicial . . . authorities of the Contracting State to which the child has been removed or in which it has been retained [the United States] shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention or unless an application under this Convention is not lodged within a reasonable time following receipt of the notice [by the state court].

Further, as noted in footnote 8, Article 16 of the Hague Convention precludes a determination of custody in an abducted-to nation, here the United States, unless and until Israel is determined not to be the habitual residence of the children in a Hague proceeding brought under ICARA.

In Mozes v. Mozes, 239 F.3d 1067, 1085 n.55 (9th Cir. 2001), upon facts very similar to those in this case, Judge Kozinski noted that,

> the [federal] district court would not be barred by the *Rooker-Feldman* doctrine from vacating the [California] Superior Court's custodial decree . . . . Because the doctrine is one of congressional intent, not constitutional mandate, it follows that where Congress has specifically granted jurisdiction to the federal courts, the doctrine does not apply.

-11-

We agree. Julie's late-blooming argument that a state court custody decision can somehow trump clearly granted federal court jurisdiction to decide and review issues of congressionally adopted policy and procedure is simply untenable. The <u>Rooker-Feldman</u> doctrine has no application under the circumstances of this case.

Even if Julie had sought Hague Convention relief under ICARA in state court, <u>Rooker-Feldman</u> would be inapposite. A final state court order arising under the congressionally assigned subject matter would, of course, deserve full faith and credit under section 11603(g) of ICARA and, perhaps, if necessary, issue and claim preclusion protections under federal common law theories of res judicata and collateral estoppel. However, <u>Rooker-Feldman</u> jurisdictional limitations would be neither necessary nor applicable.

Assuming that the <u>Rooker-Feldman</u> doctrine was somehow applicable to this case, the doctrine would strip away federal jurisdiction only if the issues in the state and federal cases were the same or "inextricably intertwined." <u>Lemonds</u>, 222 F.3d at 492-93. The question would be whether the federal district court was called upon to review the same or similar issues as those decided by the state court at an earlier time. But, the district court did not purport to review the merits of the state custody decision or, even, the jurisdiction of the state court to make a child custody decision applying state law. Thus, there was no intertwinement. More specifically, the Minnesota decisions–the referee's temporary order, the trial judge's final order and the Minnesota Court of Appeals judgment–dealt only with divorce, child custody, child support and, perhaps, peripheral and limited procedural and interstate (not international) jurisdictional issues.[14] On the other hand, the district court made no determinations whatsoever on the merits of the separation, custody, or support and,

---

[14]In <u>Cerit v. Cerit</u>, 188 F. Supp. 2d 1239 (D. Haw. 2002), the father petitioned the state court for a Hague Convention determination, and then subsequently petitioned the federal district court for the same ruling. The district court abstained on <u>Younger</u> and <u>Colorado River</u> abstention grounds. <u>Id.</u> at 1244-45.

as noted earlier, it would have been inappropriate for it to do so in a Hague Convention case. The sole decision made by the district court was whether Julie "wrongfully removed and retained" the children from their "habitual residence" in violation of the Hague treaty as adopted by ICARA. Accordingly, the district court was in no way stripped of its jurisdiction to make these determinations by even the most broad-ranging view of Rooker-Feldman.[15]

Finally, it is also probable that the state judgment of May 4, 2001, is of dubious validity for reasons other than the district court action. This is so because the November 16, 2000, Israeli court order, finding both habitual residence of the children in Israel and wrongful removal of the children from Israel, was enforceable in the United States under the treaty and ICARA. The Israeli order directed the filing of a copy of the order with the Central Agency of Israel for use in the United States under Article 15 of the treaty. Upon such a finding and filing, Article 16 of the Convention specifically precluded Minnesota from determining custody issues involving these children.

## B.    Standard of Review

Having determined that the district court had jurisdiction to decide the Hague Convention issues, we now consider which standard of review we should apply in this appeal. Both parties agree that the "grave risk of harm" determination should be reviewed de novo. The conflict arises regarding the standard of review for the district court's habitual residence determination.

This court has not yet articulated a standard of review for habitual residence determinations under the Hague Convention. Julie and the dissent argue that the

---

[15]Our jurisdiction to hear this appeal would not be affected by Rooker-Feldman unless the district court's jurisdiction was affected.

-13-

habitual residence determination is one of fact, to be reviewed for clear error. We disagree, being more persuaded by the Ninth and Third Circuits, which have determined that habitual residence determinations raise mixed questions of fact and law and therefore should be reviewed de novo. Mozes, 239 F.3d at 1073; Feder v. Evans-Feder, 63 F.3d 217, 222 n.9 (3d Cir. 1995) ("[T]he determination of habitual residence is not purely factual, but requires the application of a legal standard . . . to historical and narrative facts. It is, therefore, a conclusion of law or at least a determination of a mixed question of law and fact.").

We recognize that a habitual residence determination must be based on facts and that the facts will vary considerably in each situation. But a district court's determination of habitual residence is not devoid of legal principles. It is not a question of pure fact, to be decided without reference to statutory language and established legal precedent. It must contain an objective standard. Whether "habitual residence" is labeled an application of facts to a legal principle, analogous to a probable cause determination,[16] or an "ultimate fact[] based upon the application of legal principles to subsidiary facts," McNeilus Truck and Mfg., Inc. v. Ohio ex. rel. Montgomery, 226 F.3d 429, 437 (6th Cir. 2000), it is necessarily a determination subject to de novo appellate review.

As the court pointed out in Mozes, it is imperative that parents be able to assess the status of the law on habitual residence and wrongful removal and retention. 239 F.3d at 1072-73. If habitual residence is treated as a purely factual matter, to be decided by an individual judge in individual circumstances unique to each case, parents will never be able to guess, let alone determine, whether they are at risk of losing custody by allowing their children to visit overseas or in allowing them to

---

[16]Probable cause determinations involve the application of historical facts to a legal principle and are reviewed de novo. Ornelas v. United States, 517 U.S. 690, 696-97 (1996).

make international trips with an estranged spouse. With such uncertainty, parents experiencing marital difficulties will be less likely to allow children to travel with one parent and less likely to allow children to maintain relationships with families in other countries. Congress must have intended that there be enough consistency in these cases to prevent such a result. Indeed, we find it difficult to believe that American legislators intended to launch American citizens into such unchartable waters. Thus, we think it is not only the correct conclusion that habitual residence be a legal determination subject to de novo review, we also think it is the correct policy conclusion under the language of the Hague Convention and ICARA.

## C. Habitual Residence

The Hague Convention has two objects: (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." 19 I.L.M. 1501, Art. 1. The Hague Convention protects children from "wrongful removal or retention" from their "habitual residence." The Hague Convention defines wrongful removal,

> The removal or the retention of a child is to be considered wrongful where – a) it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Id. at Art. 3.

> Generally speaking, "wrongful removal" refers to the taking of a child from the person who was actually exercising custody of the child. "Wrongful retention" refers to the act of keeping the child without the

-15-

consent of the person who was actually exercising custody. The archetype of this conduct is the refusal by the noncustodial parent to return a child at the end of an authorized visitation period.

51 Fed. Reg. 10494. Julie concedes that she retained the children in the United States without Robert's permission and that Robert was exercising, and would have continued to exercise, his custody rights in Israel except for the removal. She argues, however, that the removal was not from the country of the children's "habitual residence," thus the Hague Convention does not apply. The district court agreed with her contention. Silverman, 2002 WL 971808.[17]

"Habitual residence" is not defined in the language of the Hague Convention or by ICARA. However, the text of the Convention directs courts to only one point in time in determining habitual residence: the point in time "immediately before the removal or retention." Art. 3. Additionally, the text of the Convention points to the child's, not the parents', habitual residence. Id. A person may have only one habitual

---

[17]The district court actually stated, "the Court determines that the habitual residence of Sam and Jacob never changed from the United States to Israel and therefore, Julie's retention of the children in the United States since June 2000 was not wrongful." Silverman, 2002 WL 971808, at *6. This is an inaccurate application of the law under the Hague Convention, because the issues of "wrongful retention" and "habitual residence" are separate inquiries. Feder, 63 F.3d at 225. A wrongful removal/retention determination involves two questions: whether the custody rights of Robert were breached by the retention and whether he was exercising those rights at the time. See id. Julie does not challenge Robert's assertion that he was exercising his custody rights at the time of the retention, therefore, she does not challenge "wrongful retention" under the Hague Convention if Israel is determined to be the place of habitual residence. On the other hand, a finding that the children's habitual residence was not Israel denies Robert relief under the Convention because a removal from Israel of any sort, wrongful or not, would not be prohibited by the treaty. Robert cannot prevail under the reach of the Convention if Julie was simply returning the children to their habitual residence in the United States.

residence, and it should not be confused with domicile. <u>Nunez-Escudero v. Tice-Menley</u>, 58 F.3d 374, 379 (8th Cir. 1995); <u>Friedrich v. Friedrich</u>, 983 F.2d 1396, 1401 (6th Cir. 1995) (hereinafter "<u>Friedrich I</u>"). "[T]he court must focus on the child, not the parents, and examine past experience, not future intentions." <u>Nunez-Escudero</u>, 58 F.3d at 379, (citing <u>Friedrich I</u>, 983 F.2d at 1401). Habitual residence may only be altered by a change in geography and passage of time. <u>Id.</u>

Federal courts are agreed that "habitual residence" must encompass some form of "settled purpose." <u>Feder</u>, 63 F.3d at 222-23. This settled purpose need not be to stay in a new location forever, but the family must have a "sufficient degree of continuity to be properly described as settled." <u>Id.</u> at 223, (citing <u>In re Bates</u>, No. CA 122-89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989)). Additionally, the settled purpose must be from the child's perspective, although parental intent is also taken into account. <u>Feder</u>, 63 F.3d at 222; <u>Friedrich I</u>, 983 F.2d at 1401.

In its determination that the Silvermans' habitual residence never changed from Minnesota to Israel, the district court enumerated its factual findings. The district court determined that 1) Robert and Julie sold their home in Minnesota prior to their move to Israel; 2) Julie wanted to move to Israel to raise her children; 3) the move was set up by the parents to be permanent; 4) the family shipped their household goods to Israel prior to their move; 5) the family rented an apartment in Israel; and 6) the children were enrolled in school in Israel and participated in activities there. <u>Silverman</u>, 2002 WL 971808, at *2-3. We need not disturb these findings. The district court coupled these facts with its factual conclusion that Julie was prevented from leaving Israel by the Tzav Ikuv from October to November of 1999 and that Robert would not have allowed Julie to leave Israel with the children from October 1999 until June 2000. Applying these facts to the Hague Convention, the district court concluded that, despite the intent present at the time of the move to Israel and the outward appearance of a permanent move, Julie's unilateral desire to return to the

United States, coupled with the alleged abuse from October 1999, eliminated the settled intent necessary to establish habitual residence. The district court erred.

The court should have looked at the habitual residence of the Silverman children at the time Julie removed them from Israel, keeping in mind that they could only have one habitual residence. The court should have determined the degree of settled purpose from the children's perspective, including the family's change in geography along with their personal possessions and pets, the passage of time, the family abandoning its prior residence and selling the house, the application for and securing of benefits only available to Israeli immigrants,[18] the children's enrollment in school, and, to some degree, both parents' intentions at the time of the move to Israel. Fairly assessing these facts, there is only one acceptable legal conclusion regarding the children's habitual residence: they were habitual residents of Israel.

The Ninth Circuit anticipated the exact type of situation faced by the district court.

> [There are] cases where the court finds that the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move. Most commonly, this occurs when both parents and the child translocate together under circumstances suggesting that they intend to make their

---

[18]The district court also relied upon the fact that the Silvermans swore in a Minnesota bankruptcy proceeding that their permanent address was Minnesota and they signed an income tax return listing Minnesota as their permanent address. While these are interesting facts showing the lack of integrity of both parties, they are not legally sufficient to overcome the overwhelming facts showing that the Silvermans physically left Minnesota, moved everything to Israel, and swore to the Israeli government that they were permanent immigrants. The Minnesota address listed on the bankruptcy proceeding is not the only misstatement by the Silvermans in that proceeding. Julie also concealed a $9000 "gift" to her father before she filed for the bankruptcy.

home in the new country. When courts find that a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another, they are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled purpose.

Mozes, 239 F.3d at 1076-77.

In Feder, the Third Circuit reversed a trial court's determination of habitual residence in a case with several facts similar to this one. 63 F.3d at 220 & 224. The parents moved to Australia with their son. The father intended to stay there, while the mother had doubts about her marriage and about Australia. The family did not sell their house in the United States, but did buy one in Australia. Six months after moving to Australia, the mother took the son on a "vacation" to the United States and, while there, filed for divorce and custody. Id. The trial court found that the son's habitual residence was the United States because the mother never decided for sure to stay in Australia. The Third Circuit reversed, emphasizing the need to look at both parents' intentions and the lifestyle of the son (who had enrolled in school in Australia), discounting the mother's plan to return to the United States if the marriage failed while in Australia. Id. These facts are analogous to the facts in this case and we agree with the Third Circuit that one spouse harboring reluctance during a move does not eliminate the settled purpose from the children's perspective.

The district court also failed to consider that Julie initially contemplated a divorce in Israel, although the record supports this fact, especially given her testimony that her reluctance was not based upon living in Israel but upon the viability of her marriage. When she contacted an attorney in Israel, however, she was told that she would lose custody of her children in the Israeli Rabbinical courts. In Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir. 1995), this court addressed a "habitual residence" issue by referring to the primary purpose of the Hague Convention: "to restore the *status quo ante* and to deter parents from crossing international boundaries

in search of a more sympathetic court." This court upheld the district court's decision to return children to their father in Poland after their mother, who was having marital difficulties, took them to the United States, without the consent of her husband, to obtain a divorce and custody. Id. This case is analogous. After speaking with her attorney in Israel, but without filing for a divorce or custody there, Julie moved to the United States and promptly obtained the desired custody decision here. This appears to be the sort of forum shopping addressed in Rydder that the Convention was designed to prevent. Id.

Finally, the district court also found that the habitual residence of the children did not change because Julie's residence in Israel was coerced due to the abuse she suffered. Habitual residence is not established when the removing spouse is coerced involuntarily to move to or remain in another country. Tsarbopoulos v. Tsarbopoulos, 176 F. Supp. 2d 1045, 1055 (E.D. Wash. 2001) (father's intent to remain in foreign country concealed from mother and abuse of mother and children eliminated any choice in the move); Ponath v. Ponath, 829 F. Supp. 363, 367 (D. Utah 1993) (move was expressed to be, and intended by mother to be, an extended vacation). Unlike the situations in Tsarbopoulos and Ponath, the record here establishes that there was no abuse prior to the move or for at least two months after the move, there was no coercion in getting Julie to move to Israel, and there is no alleged abuse of the children. Julie intended to move permanently to Israel prior to the move and, upon arrival in July, she intended to make Israel her home. She was the primary force behind the family's relocation to Israel and she always intended to return to Israel to raise her children.[19] Her subsequent, post-move desire to return to the United States, and the finding by the district court that she was subjected to coercion and abuse beginning two months after her arrival, does not change the legal conclusion that the habitual residence of the children changed from Minnesota to Israel.

_____

[19]Prior to marrying Robert, Julie spent two years of high school, one year of college, and two years working (1987-1989) in Israel.

For these reasons, we find that the children's habitual residence is in Israel and that Robert has met his burden of presenting a prima facie case under the Convention.

### D. Grave Risk of Harm

The district court found that even if the children's habitual residence is in Israel, they need not be returned to Israel because they will face a "grave risk of physical harm" there. Silverman, 2002 WL 971808, at *8. The district court reached this conclusion, in part, because the violence in Israel makes it a "zone of war," which is dangerous for the children. Id.

The "grave risk of physical or psychological harm" defense is an affirmative defense under Article 13(b) of the Convention that Julie must prove with clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A); Friedrich I, 983 F.2d at 1400. In Rydder, this court held that in order to apply the Article 13(b) exception, the court would need to cite specific evidence of potential harm to the individual children. 49 F. 3d at 373. There are two types of grave risk that are appropriate under Article 13(b): sending a child to a "zone of war, famine, or disease," or in cases of serious abuse or neglect. Friedrich v. Friedrich, 78 F.3d 1060, 1069 (6th Cir. 1996) (hereinafter "Friedrich II"); Blondin v. Dubois, 238 F.3d 153, 162 (2d Cir. 2001).

The district court found that the current situation in Israel constitutes a "zone of war," warranting application of the "grave risk" exception. In Freier v. Freier, 969 F. Supp. 436, 443 (E.D. Mich. 1996), the district court found that Israel in 1996 was not a "zone of war" under Article 13(b). In so finding, the court determined that the fighting was fifteen to ninety minutes from the children's home, no schools were closed, businesses were open, and the mother was able to travel to and from the country. Id. No subsequent case has found that Israel is a "zone of war" under the Convention. In fact, there does not appear to be another case that finds any country

-21-

a "zone of war" under the Convention.[20] Nor does the district court cite any evidence that these children are in any more specific danger living in Israel than they were when their mother voluntarily moved them there in 1999. Rather, the evidence centered on general regional violence, such as suicide bombers, that threaten everyone in Israel. This is not sufficient to establish a "zone of war" which puts the children in "grave risk of physical or psychological harm" under the Convention.

Additionally, the district court erred in taking into account the "fact that Sam and Jacob are settled in their new environment." Silverman, 2002 WL 971808, at *10. A removing parent "must not be allowed to abduct a child and then–when brought to court–complain that the child has grown used to the surroundings to which they were abducted." Friedrich II, 78 F.3d at 1068.

Israel is not a "zone of war" as meant by the Convention and, therefore, Julie has not met her burden of proving that a grave risk of harm exists. As no other exception applies, the district court erred in denying Robert's Hague petition.

## III. CONCLUSION

For the reasons stated above, we reverse the district court. Israel is the habitual residence of the Silverman children and Julie wrongfully removed the children from their habitual residence. The Convention requires us to return wrongfully removed children to their habitual residence, unless specific, limited exceptions apply. No exceptions to the Hague Convention apply, and the Minnesota court's custody determination cannot be used to prevent us from returning the children to Israel. 51 Fed. Reg. 10494-01, § ID1. Israel is the proper forum for a custody determination.

---

[20]The district court and Julie did not cite any cases to the contrary. On August 13, 2002, in Mendez Lynch v. Mendez Lynch, the District Court of Florida considered, and rejected, a claim that Argentina is a zone of war under the Convention. 220 F. Supp. 2d 1347, 1365-66 (M.D. Fla. 2002).

-22-

We remand for entry of an order that the Silverman children be returned to Israel for a custody determination in the Israeli courts.

MELLOY, Circuit Judge, concurring in part and dissenting in part.

I concur with all of the majority opinion in this case, with the exception of Division III. Division III states that no exceptions to the Hague Convention apply and remands the case for entry of an order returning the children to Israel. I dissent from that portion of the majority opinion for the reason that it does not address Judge Heaney's argument that one of the Hague Convention defenses as to removal is a finding: ". . . that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention on the Civil Aspects of International Child Abduction, Art. 13, 19 I.L.M. 1501, 1502-03 (1980).

In this case, the district court made a finding that Samuel is of sufficient age and maturity to express his views and that he does not wish to be returned to Israel. The majority does not address that finding. I find nothing in the record to indicate that such a finding is clearly erroneous. At a minimum, I agree with the dissent that the case should be remanded for further proceedings to determine the views, if any, of both Samuel and Jacob, and for a further determination as to whether each child has attained an age and degree of maturity for which it would be appropriate to take into consideration their views.

Accordingly, I concur in the well-reasoned decision of the majority, with the exception of that portion of the conclusion which failed to remand the case for a further determination as to the views of each child and their level of maturity.

HEANEY, Circuit Judge, with whom McMILLIAN, MURPHY, and BYE, Circuit Judges, join dissenting.

I respectfully dissent. Assuming a habitual residence determination raises mixed questions of law and fact, the result reached by the majority is inconsistent with <u>Mozes v. Mozes</u>, 239 F.3d 1067 (9th Cir. 2001), a case upon which the majority heavily relies. It is well settled that where the primary issue is whether the parents intended to abandon a prior habitual residence, great deference must be given to the factual findings of the district court. Here, the district court unequivocally found that, based on the entirety of the evidence, Robert and Julie Silverman did not have a mutual, settled intent to abandon the United States as their children's primary residence. The district court found their habitual residence remained the United States, and this finding is not clearly erroneous. Thus, the district court must be affirmed.

Even if one agrees with the holding of the majority that Israel is the habitual residence of the Silverman children, Samuel and Jacob, the Hague Convention dictates that it is still necessary to remand the case to the district court for a determination of whether Samuel should return to Israel in view of his strongly stated desire to remain in the United States with his mother. If it finds that Samuel's views are sufficiently mature to require acquiescence by the district court, that should end the matter. If not, the court must still consider the psychological harm he may suffer from being ordered to return to Israel. Moreover, the district court must also consider Jacob's views on the matter. If Jacob's views are not sufficiently mature to be controlling, the district court must still consider whether he would be psychologically harmed by being removed from his family in the United States.[21]

---

[21]I do not disagree with the majority's view with respect to the <u>Rooker-Feldman</u> doctrine.

## I. BACKGROUND

At the outset, it is important that we set straight the background facts recited in the majority's opinion. Although the majority quotes Julie as testifying that she was always the one pushing to move to Israel, (Tr. 8), it neglects to point out that Julie subsequently testified, "I couldn't imagine making a permanent move so far away from my family and my home if my marriage was going to not work." (Tr. 89.) Robert seconded this view of Julie's intentions. He testified that he had examined e-mails sent to Julie by her current husband: "It was never [Julie's] intention to leave and be [with me] in Israel, but to be with this gentleman." (Tr. 42.)

The majority states that Robert and Julie lived with relatives in Israel from July 1999 to November 1999, when they signed a one-year lease for an apartment. Notably, it concedes that Robert would not have allowed Julie to leave Israel with the children at any point between October 1999 and June 2000. In fact, Robert's testimony was that he would not have permitted the children to leave Israel as early as September of 1999. (Tr. 59.) Thus, even by Robert's own testimony, Julie remained in Israel of her own free will for only one month, hardly a sufficient period of time to establish a joint intention that Israel would be the habitual residence of Samuel and Jacob. See, e.g., In re Application of Ponath, 829 F.Supp. 363, 367 (D. Utah 1993) (finding no habitual residence where mother and child detained for months by means of coercion).

Sometime in January 2000, Robert and Julie returned to Minnesota to complete bankruptcy proceedings. At that time both stated that their permanent address was Plymouth, Minnesota. (Tr. 57.) While living in Israel in April 2000, Robert and Julie signed and filed a joint United States income tax form for 1999, listing their address as Plymouth, Minnesota. (Tr. 58.) They made these declarations either under oath or under penalty of perjury. The majority gives little weight to these factors, suggesting this could only mean that both Robert and Julie lied when they claimed

-25-

Minnesota as their address. The fact is that Julie considered the United States to be her habitual residence and that of Samuel and Jacob at all times during these proceedings, a position adopted by the district court. Julie's position as to residency has been consistent throughout; it is only Robert who has claimed different residences–first Minnesota for tax and bankruptcy proceedings, then Israel for family law proceedings–to suit his needs. In my view, the district court properly considered the documents indicating the Silvermans were Minnesota residents as adding to the weight of the evidence that the couple never shared a intention to make Israel their habitual residence.

Julie contends that Robert engaged in threats, physical abuse, and coercion to force her to remain in Israel. In footnote six of its opinion, the majority concurred with the district court that there was physical violence against Julie by Robert, but went on to state: "[W]e do find it prudent to note that Julie also engaged in physical violence towards Robert." Ante at 3, n.6. Julie's testimony about the incident paints a different picture:

> [Robert] picked me up from the airport after I had stayed a few extra days for the bankruptcy. He started screaming at me that I had been with Steve. He pushed my head against the window, so I flung back this way. I hit him in the mouth, on this corner, and I made him bleed.
>
> And at that point, he leaned over and opened the car door while he was driving. He couldn't get the seat belt undone.

(Tr. 96-97.) In response to the question, "How did you interpret when he leaned over to open the car door?" Julie answered, "That he was going to push me out of the car." (Tr. 97.) Julie also testified that at other times Robert would "hold me up against the wall and bang me. There were stone walls in our apartment. And he would ask me to tell him that I didn't love Steve." When asked if she was physically injured as a

result, she responded, "I was not injured. I was hurt. I mean he was slamming me against the wall." Id.

## II.    ANALYSIS

### A.    Habitual Residence of the Children

I begin my analysis by considering the applicable standard of review. The majority overstates the matter, leaving one with the impression that we should essentially impose our own view of habitual residence, giving no deference to the district court's superior position in assessing the circumstances. The Second Circuit recently stated the applicable standard of review in cases arising under the Hague Convention. See Blondin v. DuBois, 238 F.3d 153 (2d Cir. 2001). The district court's factual determinations are reviewed for clear error, while the district court's legal analysis is subject to de novo review. Blondin, 238 F.3d at 158 (citing Croll v. Croll, 229 F.3d 133, 136 (2d Cir. 2000); Walsh v. Walsh, 221 F.3d 204, 214 (1st Cir. 2000); Shalit v. Coppe, 182 F.3d 1124, 1127 (9th Cir. 1999); Lops v. Lops, 140 F.3d 927, 935 (11th Cir. 1998); and Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir. 1996)). Stated another way, the interpretation and application of treaty language is reviewed de novo, but the underlying factual findings are reviewed for clear error. Blondin, 238 F.3d at 158 (citing Feder v. Evans-Feder, 63 F.3d 217, 222 n.9 (3d Cir. 1995); and Cree v. Flores, 157 F.3d 762, 768 (9th Cir. 1998)). Accepting this analysis, we review the district court's factual findings, including its finding that there was no settled intent to abandon the United States, for clear error. Accord Mozes v. Mozes, 239 F.3d 1067, 1075-76 (9th Cir. 2001) ("Whether there is a settled intention to abandon a prior habitual residence is a question of fact as to which we defer to the district court.")

The majority's reliance on Mozes to support its position that we review the district court's habitual residence determination de novo standard is specious. A

-27-

close reading of <u>Mozes</u> reveals that it is indeed a slender reed upon which to base the conclusion reached by the majority. <u>Mozes</u> clearly stands for the proposition that the intent of the parties to abandon a prior habitual residence is an issue of fact to be determined by the district court, to which we owe great deference. Here, the district court unequivocally found that the Silvermans had not abandoned their habitual residence in the United States.

In <u>Mozes</u>, Arnon and Michal were Israeli citizens who married in 1982. They had four children ranging in age from seven to sixteen years old. In April 1997, with Arnon's consent, Michal and the children moved to Los Angeles, where she leased a home, purchased an automobile, and enrolled the children in school. Arnon remained in Israel, but he paid for both the house and the car used by the family, and stayed with them during his visits to Los Angeles. One year after Michal and the children arrived in the United States, she filed an action in California state court seeking a dissolution of the marriage and custody of the children. The court granted temporary custody to Michal and entered a temporary restraining order enjoining Arnon from removing the children from southern California. Less than one month later, Arnon filed a petition in federal district court seeking to have the children returned to Israel under the Hague Convention. The oldest child elected to return to Israel and did so by mutual agreement. The district court denied the petition of the father with respect to the other three children, one age nine and two age five, and the husband appealed to the Ninth Circuit.[22]

In a lengthy opinion, the appellate court stated that the first question to be answered is whether there was a settled intention to abandon the family's prior

_____

[22]In <u>Mozes</u>, the children had lived in Israel their entire lives and were taken by their mother, Michal, to Los Angeles where they remained for one year before Michal began an action to obtain custody of the children. Here, we have the reverse situation. The children lived in the United States their entire lives, were taken to Israel, and remained there voluntarily for only one month.

habitual residence. <u>Mozes</u>, 239 F.3d at 1075-76. The court emphasized that this was a question of fact, to which we defer to the district court. <u>Id.</u> at 1076. "[T]he intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of a child's residence," <u>id.</u> (citation and internal quotation marks omitted), which in this case would be both parents. Where the parents disagree, the courts must determine from all available evidence whether the parent petitioning for the return of the child has established by a preponderance of the evidence that the habitual residence is the place where petitioner claims it to be. 42 U.S.C. § 11603(e)(1); <u>see Mozes</u>, 239 F.3d at 1083 (stating petitioner bears burden of showing "brute facts" that point unequivocally to conclusion that parents jointly intended to alter habitual residence). Where the evidence is conflicting, the finding of the district court is entitled to great deference. <u>Mozes</u>, 238 F.3d at 1077-78.[23]

The majority errs in this regard by focusing only on Robert's intent and disregarding the intentions of Julie. The district court found:

> [T]he habitual residence of Sam and Jacob never changed from the United States to Israel and therefore, Julie's retention of the children in the United States since June 2000 was not wrongful. With the exception of the eleven months spent in Israel, Sam and Jacob have spent their entire lives in the United States. The evidence also indicates that their time in Israel would have been much shorter had Julie not been prevented from leaving Israel with the children from [September] 1999 until June of 2000.

_____

[23]In <u>Feder v. Evans-Feder</u>, 63 F.3 217 (3d Cir. 1995), the Third Circuit recognized that a determination of the habitual residence necessitates consideration of the shared intention of the parents, <u>id.</u> at 224, and that where parents disagree the question is whether the petitioner has established by a preponderance of the evidence that the habitual residence is where petitioner claims it to be, <u>id.</u> at 222. The <u>Feder</u> court did not discuss the important question decided in <u>Mozes</u>, i.e., whether the determination of the parents' settled intent to alter their habitual residence is a factual finding.

<u>Silverman v. Silverman</u>, No. 00-2274, 2002 WL 971808, at *6 (D. Minn. May 9, 2002). Where the intent to abandon a prior habitual residence is a critical issue, as it is here, the district court's findings effectively control the decision as to the habitual residence of the children. <u>Mozes</u>, 239 F.3d at 1072-73. These are obviously factual findings, entitled to great deference, and we are obligated to accept them unless they are clearly erroneous. In my view, they are not.

Contrary to the impression left by the majority, the court in <u>Mozes</u> did not find that the parents had a settled intent to abandon Israel as their habitual residence. In fact, it did not decide that issue. It rather remanded the matter to the district court to make that determination, reaffirming that the burden of proof rested with the petitioner.[24] In this case, the district court has already made those findings, and concluded that the children's habitual residence remained the United States because the Silvermans did not have a shared intention to abandon the United States.

The district court here did precisely what was required of it under the Hague Convention–it examined all of the circumstances and determined that the Silvermans did not have a mutual, settled intent to abandon the United States as the habitual residence of their children. Its decision is fully supported by the record evidence in this case. The majority selectively emphasizes a few facts that might have led the district court to a contrary conclusion, particularly that the Silvermans had sold their house and moved their belongings to Israel. However, by training its focus so intently on these few facts, the majority glosses over those that weaken its position: the family was only away from the United States for a short time (even shorter when one considers that ten of the eleven months Julie and the children spent there were

---

[24]The appellate court stated that "the appropriate inquiry under the Convention is whether the United States had supplanted Israel as the locus of the children's family and social development. As the district court did not answer this question, we must remand and allow it to do so." <u>Mozes,</u> 239 F.3d at 1084.

under duress); they never bought real property while in Israel; and, perhaps most importantly, they maintained that Minnesota was their home in two separate proceedings, both of which occurred while they were living in Israel. In light of the complete record, it is clear that the district court was well within its discretion in finding that Robert did not carry his burden. I would affirm the district court's habitual residency determination.

## B. Affirmative Defenses to Removal

I next come to the question of whether Samuel and Jacob should be returned to Israel if it is their habitual residence. Article 13 of the Hague Convention provides:

> [T]he judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that –
>
> . . . .
>
> there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.
>
> The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

Hague Convention on the Civil Aspects of International Child Abduction, art. 13, 19 I.L.M. 1501, 1502-03 (1980).

Here, the district court held that even if it had determined that Israel was the habitual residence of Samuel and Jacob, it found in the alternative "that their return

-31-

to Israel would pose a grave risk of physical harm or otherwise place them in an intolerable situation." Silverman, 2002 WL 971808, at *8. The district court noted that in Freier v. Freier, 969 F. Supp. 436 (E.D. Mich. 1996), evidence of unrest in Israel was insufficient to establish the grave risk defense. The district court went on to say that it did not agree with Freier's conclusion in this case because:

> Significant differences exist between the violence occurring at the time Freir [sic] was decided and the violence occurring in Israel today. Unlike before, the violence has permeated areas that were previously unaffected by the conflict. Furthermore, the type of violence, through suicide bombings, has placed civilians, including children, at much greater risk. The level and intensity of violence occurring in Israel today thus goes well beyond "some unrest" described in Freier. In the Court's view, the current situation in Israel meets the "zone of war" standard contemplated by the Sixth Circuit in Friedrich.[25]

Silverman, 2002 WL 971808, at *10.

The majority rejects these findings, and instead resolves that Israel is not a zone of war as meant by the Convention. While I agree with this conclusion, neither the district court nor this court have answered the question of whether returning the children to Israel, given its current conditions, may cause them to suffer psychological harm. In my view, the fact that the specific area in which Samuel and Jacob would live is not a zone of war, still does not answer the question of whether they will be psychologically harmed because of the situation that currently exists in Israel.[26] Moreover, it would clearly be harmful for the children to be removed from

---

[25]Friedrich v. Friedrich, 78 F.3d 1060 (6th Cir. 1996).

[26]On this point, I believe it particularly relevant to reference a lengthy letter written by Samuel to the district court. In it, he expressed his concern about returning to Israel, and made clear that he was worried about his own and his brother's safety if they were forced back. (Appellant's App. at 286-87.) As this is direct evidence of

the United States and their mother, or each other, after spending the great majority of their lives here. Therefore, I believe we have no alternative but to remand to the district court to determine whether Samuel and Jacob will be subjected to psychological harm if they are separately or collectively removed from their mother's home in the United States and forced to return to Israel[27].

Additionally, the majority does not consider the finding of the district court that Samuel objects to returning to Israel and that he is mature and old enough for the court to consider his views.[28] The district court notes:

> The evidence presented at the hearing reveal[s] that Sam is a very bright and intelligent individual. He is a gifted child, which means he is in a class that is on par with his academics. He reads newspapers each day to follow events in Israel. The Court is particularly impressed by his behavior in learning of the upcoming legal proceedings and his desire to express his views in a letter and have them considered by the Court. The Court witnessed Sam's maturity firsthand in discussions with him

the psychological harm Samuel would suffer if returned, I believe it proper for the district court to consider the letter for that purpose.

[27]Of course, Julie would bear the burden of proving by clear and convincing evidence the children would be harmed psychologically by removal. 42 U.S.C. § 11603(e)(2)(A).

[28]As mentioned in footnote six of this dissent, Samuel wrote a lengthy letter to the district court in which he made clear his wishes. He stated that he was writing to inform the court that he wanted to live in the United States, largely because of his familial, social, and educational ties. He also noted that while he misses his father and some friends in Israel, he would not want to live there in large part because he believes it to be a dangerous place for him and his brother. The majority opinion makes no mention of Samuel's letter. I agree with the district court that it is relevant and helpful to our decision.

-33-

> in chambers after the hearing. In both the Court's private discussions with Sam and in the presence of counsel, the Court was impressed by the level of maturity exhibited by Sam. It was evident that he understood the purpose and significance of these proceedings. . . . Finally, the Court finds that Sam, at age 10, is sufficiently old enough to have his views considered.

Silverman, 2002 WL 971808, at *10.

I agree with the district court that Samuel is mature enough to make his own decisions on this matter, and he clearly articulates the reasons he does not want to return to Israel. His decision on that matter should be respected. Blondin, 238 F.3d at 165-66. Because Article 13 gives courts authority to refuse to return children where 1) the child, of sufficient age and maturity, objects to returning to his habitual residence, or 2) there is evidence that returning the child will expose the child to psychological harm, the district court, on remand, should strongly consider these exceptions for Samuel, in light of his letter and other evidence.

This leaves the question of Jacob's fate. Jacob will be eight years old in July of 2003. He has not yet expressed his views to the court on this matter, nor has the district court determined if he is sufficiently mature to bring Article 13 into play. If Jacob now wishes to be heard, the district court should allow him to state his feelings. If his views are sufficiently mature and he wants to stay in the United States, that would end the matter. However, in light of Samuel's stated wishes, even if Jacob does not make his views known, the district court must still assess the psychological harm that would result if Jacob were returned to Israel and likely separated from his older brother.

## CONCLUSION

I agree with the district court that this case should be settled by the parties rather than by the court. There is no good reason why Robert and Julie should not be able to agree on a plan which would permit both parents to share custody of the children. Failing an agreement between the parents, we have no alternative but to affirm the district court. The Ninth Circuit, the font of many decided cases in this difficult area of law, makes it crystal clear that the question of whether the parents of minor children have a joint, settled intention to abandon a habitual residence is a question of fact. This must, of course, be determined by the district court and reviewed by our court on the clearly erroneous standard. Having found no reported cases to the contrary, I would affirm the district court's well-supported decision.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.