**Matthew LOFTIS, Petitioner,**

v.

**Jennifer LOFTIS, Respondent.**

**Civil Action No. H–14–2896.**

United States District Court, S.D. Texas, Houston Division.

Signed Dec. 11, 2014.

Ashley V. Tomlinson, Laura D. Dale, Laura Dale & Associates, P.C., Houston, TX, for Petitioner Matthew Loftis.

Marisa Cristina Balderas, Law Office of Marisa C. Balderas, Gary Caswell, Attorney at Law, San Antonio, TX, for Respondent Jennifer Loftis.

### FINDINGS OF FACT & CONCLUSIONS OF LAW

DAVID HITTNER, District Judge.

On November 24, 2014, this Court commenced a non-jury trial in the above-entitled matter, during which the Court received evidence and heard sworn testimony. Having considered the evidence, testimony, and oral arguments presented during trial, along with post-trial submissions and the applicable law, the Court now enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Any finding of fact that should be construed as a conclusion of law is hereby adopted as such. Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.

## I. BACKGROUND

This case involves the alleged wrongful removal of a child pursuant to the Hague Convention (the "Convention")[1] and the International Child Abduction Remedies Act ("ICARA").[2] Petitioner Matthew Loftis ("Petitioner") alleges his wife, Jennifer Loftis ("Respondent"), wrongfully removed their nineteen-month-old daughter, BKL, from Denmark to the United States in October 2014. Petitioner filed suit in this Court on October 13, 2014, asking the Court to order the return of BKL to her "habitual residence" of Denmark. Respondent claims Petitioner alienated her from her family and was psychology abusive during their marriage. Respondent contends she is unable to live in Denmark because of this alleged abuse and other practical obstacles like employment and the language, and therefore Respondent claims the return of BKL would place the child in an intolerable situation because BKL would inevitably be separated from her mother.

## II. FINDINGS OF FACT[3]

The following facts have been established by a preponderance of the evidence:

1. The parties, Petitioner Matthew Loftis and Respondent Jennifer Loftis, were married in Texas on August 24, 2002.

2. The parties experienced problems throughout their marriage and discussed divorce numerous times.

3. The parties lived in South Korea from December 2003 until December 2004 where they both taught English as a second language. Respondent voluntarily moved to South Korea.

4. The parties visited the United States from December 2004 until February 2005.

5. The parties lived in Romania from February 2005 until October 2007, where Respondent taught English as a second language as a missionary and Petitioner obtained his master's degree. Respondent voluntarily moved to Romania.

6. From October 2007 through December 2007, the parties volunteered in Costa Rica.

7. From December 2007 through January 2008, the parties visited the United States, followed by a visit to Romania in February 2008.

8. From March 2008 until February 2009, the parties moved to South Korea, where they taught English as a second language. Respondent voluntarily moved to South Korea.

9. In February 2009, the parties moved to Houston, Texas while Petitioner waited for admission to a Ph.D. program in political science. Petitioner was accepted to the Ph.D. program at Rice University in Houston, Texas, at which time the parties leased an apartment in Houston. Respondent worked as a teacher for a private company and then for Houston Independent School District for two school years.

10. The parties have one daughter, BKL, who was born in Texas on February 25, 2013.

11. In May 2013, the family travelled to Brussels, Belgium for a period of two months for Petitioner to conduct research.

1. Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11670, 1988 WL 411501, *reprinted in* 51 Fed.Reg. 10,494 (March 26, 1986).

2. International Child Abduction Remedies Act, 42 U.S.C.A. § 11601 *et seq.* ("ICARA").

3. Unless otherwise noted, the findings of fact contained herein are based on the testimony presented at the November 24, 2014 trial.

Respondent voluntarily travelled to Belgium.

12. Before departing for Belgium in May 2013, the parties vacated their Houston apartment and put their possessions in storage. The parties did not renew their lease or obtain a new lease in Houston after May 2013. After leaving Houston in 2013, the parties stayed with Petitioner's family whenever they returned to the United States.

13. The parties had a shared intent to abandon their residence in the United States in May 2013.

14. In August 2013, the parties moved from Belgium to Mannheim, Germany, where Petitioner completed the last year of his Ph.D. Petitioner obtained his Ph.D. in political science from Rice University in April 2014.

15. While in Germany, BKL attended day care and had a pediatrician.

16. In late 2013, Petitioner began seeking employment at universities in Europe and the United States. Throughout his job search, Petitioner elicited Respondent's opinion and preferences as to where the family should live.[4] During Petitioner's job search, Respondent expressed a desire to live in Europe.

17. In February 2014, Petitioner learned of a job prospect at the University of Aarhus in Aarhus, Denmark. On March 13, 2014, Petitioner had an interview with Aarhus University. During the interview, Petitioner obtained information about opportunities for Respondent in Denmark, including employment and extracurricular activities.[5] On March 14, 2014, Petitioner received an offer for a position as an assistant professor at Aarhus University.

18. Respondent expressed enthusiasm about living in Aarhus before and after Petitioner received his offer for a position.[6] On February 25, 2014, Respondent told Petitioner that she would like to live in Aarhus.[7] On March 12, 2014, Respondent told Petitioner that Aarhus would "be a pretty awesome place to live" and "the best place we've lived so far." [8]

19. On April 4, 2014, Respondent informed Petitioner that she did not want to move to Denmark with Petitioner as a married couple.[9] Respondent informed Petitioner that she "will move to Denmark to be with [BKL], but I won't live with you. You can have her half the year and I can have her half the year. This way, we will both learn Danish and be able to be with her ... I don't want your money. I will get a job and I will be perfectly capable of paying for myself and [BKL]." [10] The Respondent also told Petitioner that she "would never take [BKL] from you" and that "I know that I shouldn't be this angry ... I think you are a good person. I just think that we don't work." [11]

---

4. *Plaintiff's Exhibits*, Exhibit 43 (*February 25, 2014 chat*); *Plaintiff's Exhibits*, Exhibit 44 (*January 30, 2014 chat*).

5. *Plaintiff's Exhibits*, Exhibit 9 (*May emails regarding teaching positions*).

6. *See, e.g., Plaintiffs Exhibits*, Exhibit 36 (*April 1, 2014 Facebook post*) (including a painting of Aarhus created by Respondent).

7. *Plaintiff's Exhibits*, Exhibit 1 (*February 25, 2014 chat*).

8. *Plaintiff's Exhibits*, Exhibit 2 (*March 12, 2014 chat*).

9. *Plaintiff's Exhibits*, Exhibit 4 (*April 4, 2014 emails*) [hereinafter *April 4, 2014 emails*].

10. *April 4, 2014 emails, supra* note 9.

11. *April 4, 2014 emails, supra* note 9.

20. Petitioner and Respondent eventually reconciled while in Germany.

21. On April 10, 2014, the parties purchased roundtrip tickets for the entire family from Germany to the United States, departing May 25, 2014 and returning July 14, 2014.[12]

22. From April 29, 2014 through May 1, 2014, Petitioner travelled to Aarhus, Denmark to visit the university. Respondent and BKL remained in Germany.

23. On May 1, 2014, while Petitioner was in Denmark, Respondent told Petitioner that "Denmark probably has most of my 'my haves' for settling somewhere." [13]

24. The parties corresponded with an acquaintance in Denmark regarding opportunities for the Respondent to teach English as a second language in Denmark.[14]

25. On May 5, 2014, Respondent obtained a copy of her criminal records in Germany in order to apply for a teaching position in Denmark.[15]

26. On May 25, 2014, the family travelled to Houston, Texas, where they stayed temporarily with Petitioner's family.

27. There was a shared intent between the parties to abandon their residence in Germany and to establish a new habitual residence in Denmark.

28. The parties vacated their storage unit in Houston, Texas. Respondent coordinated the sale of the vast majority of their possessions in Texas, including their furniture, kitchen appliances, and vehicles.[16] Respondent testified that the only possessions remaining in Houston, Texas were keepsakes and BKL's old crib, which were stored at the home of Petitioner's parents. Respondent wanted to take BKL's crib to Denmark, but the parties decided it was impractical to ship it to Denmark; instead, they left the crib at Petitioner's parent's home.

29. On June 24, 2014, while the family was in Houston, Petitioner received and executed his employment contract with Aarhus University. The contract contained an additional monthly supplement awarded to employees who have children residing with them. The contract was for a period of three years through July 31, 2017.

30. Petitioner was encouraged by his new employer to apply for a permanent position at Aarhus University at the end of his three-year contract. In order to apply for a permanent position in three years, Petitioner was required to complete a training program, which he was also encouraged to do before the end of his contract. By May 9, 2014, Petitioner had already submitted the application for the training program.[17]

31. While in Houston, both parties applied for residency permits in Denmark.

32. In order obtain a residency permit for BKL, the Danish government required that BKL's "custody holder" sign the application for her residency permit.[18] On June 23, 2014, while in Houston, Petitioner

---

**12.** *Plaintiff's Exhibits,* Exhibit 5 (*Orbitz Travel Confirmation to Houston* ).

**13.** *Plaintiff's Exhibits,* Exhibit 7 (*May 1, 2014 emails* ).

**14.** *Plaintiff's Exhibits,* Exhibit 9 (*May 9, 2014 emails* ).

**15.** *Plaintiff's Exhibits,* Exhibit 8 (*May 2014 chats* ).

**16.** *Plaintiff's Exhibits,* Exhibit 10 (*June 11, 2014 email regarding moving sale* ).

**17.** *Plaintiff's Exhibits,* Exhibit 39 (*May 9, 2014 email regarding Teacher Training Application* ).

**18.** *Plaintiff's Exhibits,* Exhibit 12 (*Solemn Declaration for BKL's Residency* ) [hereinafter *Solemn Declaration for BKL's Residency* ].

signed the application for BKL's residency permit as a "custody holder."[19] In order to obtain BKL's residency permit, parents intending to reside with the child are required to execute a declaration confirming that neither had been convicted of any crimes against minor children. On June 23, 2014, while in Houston, both parties executed the declaration confirming that neither had been convicted of crimes against minor children.[20] After submitting the application, BKL was issued a residency permit by the Danish government.[21] The residency permits may be renewed upon expiration.

33. On July 7, 2014, while in Houston, the parties reserved a moving van in Mannheim, Germany in order to move the remainder of their personal belongings to Denmark.[22]

34. The parties originally intended that the entire family would return to Mannheim, Germany and drive the moving van to Aarhus, Denmark together. The parties decided the drive would be too exhausting for BKL. Instead, the parties decided that Petitioner would drive the family's belongings to Aarhus and Respondent and BKL would join him on August 6, 2014.

35. On July 14, 2014, Petitioner travelled to Mannheim, Germany as planned.

36. Respondent left a note in Petitioner's luggage stating, "I can't wait to get there and start our new life together in Aarhus."[23]

37. On July 22, 2014, while still in the United States, Respondent stated that she was glad to be leaving the United States because she has a child and daycare is too expensive. Respondent stated that she "couldn't live here," referring to the United States.[24]

38. On July 23, 2014, the parties discussed furniture to purchase for their home in Denmark.[25]

39. On July 28, 2014, Respondent told Petitioner that she no longer wanted to remain married and that she did not want to accompany BKL to Denmark.[26] Respondent told Petitioner, "I want you to have BKL soon, I just can't bring her."[27] Respondent proposed for Petitioner's mother to accompany BKL to Denmark.[28]

40. On July 29, 2014, while still in the United States, Respondent told Petitioner, "You definitely have BKL though, I promise. I'd would so much rather her live in Denmark than the US" because "you are definitely the more stable one. You'll be settled, making great money and you're a great father. It's the best decision for sure."[29] On July 30, 2014, while still in

---

19. *Solemn Declaration for BKL's Residency, supra* note 18.

20. *Plaintiff's Exhibits,* Exhibit 38 (*Solemn Declaration Regarding Crimes Against Minor Children*).

21. *Plaintiff's Exhibits,* Exhibit 37 (*Original Danish Residence Card for BKL*); *Plaintiff's Exhibits,* Exhibit 47 (*Translated Residence Card for BKL*).

22. *Plaintiff's Exhibits,* Exhibit 13 (*Avis Reservation Confirmation*).

23. *Plaintiff's Exhibits,* Exhibit 14 (*Postcard*).

24. *Plaintiff's Exhibits,* Exhibit 16 (*July 22, 2014 chat*).

25. *Plaintiff's Exhibits,* Exhibit 17 (*July 23, 2014 chat*).

26. *Plaintiff's Exhibits,* Exhibit 18 (*July 28, 2014 chat*) [hereinafter *July 28, 2014 chat*].

27. *July 28, 2014 chat, supra* note 26.

28. *July 28, 2014 chat, supra* note 26.

29. *Plaintiff's Exhibits,* Exhibit 19 (*July 29, 2014 chat*).

the United States, Respondent told Petitioner, "I promise BKL will be there as soon as your ready. I know you will be a great father." [30]

41. Respondent admits that she was eager for BKL to join Petitioner in Denmark.

42. Petitioner's mother could not accompany BKL to Denmark until September; therefore, on August 1, 2014 she informed Petitioner that she wanted to hire a neighbor to take BKL to Denmark and to remain there until BKL, started daycare. [31]

43. Respondent admits that the parties agreed for BKL to reside in Denmark with Petitioner, that Petitioner would have primary custody, and that the parties had agreed to a visitations schedule. Respondent also admits that the parties agreed to a visitation schedule that contemplated that BKL would start school in Denmark in 2018. The parties' agreement for BKL to reside indefinitely in Denmark was not contingent on the fulfillment of certain conditions.

44. On August 5, 2014, Respondent travelled with BKL from the United States to Denmark. [32] Once in Denmark, Respondent helped Petitioner register BKL as a resident of Aarhus and discussed daycare. [33] BKL was registered as a resident of Aarhus, Denmark on August 28, 2014.

45. Respondent planned to remain in Denmark until BKL was accepted into daycare, and was disappointed when BKL could not start day care until September 16, 2014, because she wanted to return to the United States. [34]

46. Respondent painted the bedroom furniture that Petitioner purchased for BKL. [35] All of BKL's belongings from Germany had been moved to her room in Denmark.

47. On August 29, 2014, before Respondent departed Denmark, Petitioner drafted an email to an attorney with the terms of the parties' custody agreement. [36] Petitioner's email stated that the parties agreed that he would have primary custody, that his primary residence is in Europe, and that the divorce decree needs to award him rights to renew BKL's residency permit. [37] Petitioner sent the draft to Respondent and told her "feel free to make changes." [38] Respondent replied that the email to the attorney "sounds perfect." [39] The parties never hired the attorney.

48. When Respondent departed Denmark, she left a farewell note to BKL stating that she was sorry to leave BKL, but needed to be happy in order to be a good mother. Respondent further stated

30. *Plaintiff's Exhibits,* Exhibit 20 (*July 30, 2014 chat* ).

31. *Plaintiff's Exhibits,* Exhibit 21 (*August 1, 2014 chat* ).

32. *Plaintiff's· Exhibits,* Exhibit 22 (*Expedia Travel Confirmation* ).

33. *Plaintiff's Exhibits,* Exhibit 23 (*August 2014 chat* ), *Plaintiff's Exhibits,* Exhibit 25 (*August 27, 2014 chat* ).

34. *Plaintiff's Exhibits,* Exhibit 24 (*August 19, 2014 chat* ).

35. *Plaintiffs Exhibits,* Exhibit .35 (*Photos of BKL* ).

36. *Plaintiff's Exhibits,* Exhibit 27 (*August 28, 2014 email to lawyer* ) [hereinafter *August 28, 2014 email to lawyer* ].

37. *August 28, 2014 email to lawyer, supra* note 36.

38. *August 28, 2014 email to lawyer, supra* note 36.

39. *August 28, 2014 email to lawyer, supra* note 36.

that she would love BKL "from a distance."[40]

49. Despite Respondent's desire to end the marriage with Petitioner and stay in the United States, the parties' last shared agreement was for BKL to habitually reside in Denmark.

50. Respondent left Denmark on September 4, 2014.

51. On September 16, 2014, BKL started daycare in Denmark. The teachers and staff at BKL's daycare were fluent in English. BKL adjusted more quickly than the daycare staff expected; therefore, BKL was able to start attending daycare for more extended hours.[41]

52. Respondent returned to Denmark on October 1, 2014. After Respondent arrived on October 1, 2014, Petitioner went to work and left BKL at home with Respondent. When Petitioner returned home from work that evening, Respondent and BKL were gone and on their way back to the United States.

53. After Respondent removed BKL from her home in Denmark, Petitioner filed an application for termination of joint custody and temporary award of sole custody in Denmark.

54. The Danish authorities granted Petitioner's application for termination of joint custody and temporarily awarded him sole custody.[42] In support of its order, the Danish authorities made the following findings and conclusions: (a) "The Danish Act on Parental Responsibility empowers the Minister of Children, Gender Equality, Integration and Social Affairs to temporarily grant the other parent sole custody when parents have joint custody, and there is a risk that one of them will bring the child out of the country, thereby anticipating a decision on custody (section 27);"[43] (b) "If the parents have joint custody, and they disagree on custody, both must provide consent in order for the child to leave the country ... or to extending the child's residence abroad;"[44] (c) "None of the parents should be able to improve their capacity to win a custody trial by bringing the child to another country."[45]

55. On October 6, 2014, Petitioner filed his Application for the Return of Child with the Central Authority for Denmark.[46]

56. Respondent admits that Petitioner has rights of custody under Danish law within the meaning of Articles 3 and 5 of the Convention (i.e. rights that are held either jointly or alone and that "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.")[47]

57. In September 2014, Respondent contacted her estranged mother when Respondent returned to the United States. She and her mother then began making plans to bring BKL to the United States.

58. Respondent testified that Petitioner was responsible for alienating her from her family and denied abuse by her family. However, evidence was presented that Re-

**40.** *Plaintiff's Exhibits,* Exhibit 51 (*April 9, 2014 Note to BKL* ).

**41.** *Plaintiff's Exhibits,* Exhibit 30 (*September 9, 2014 email regarding BKL's daycare* ).

**42.** *Plaintiff's Exhibits,* Exhibit 33 (*Custody Letter* ) [hereinafter *Custody Letter* ].

**43.** *Custody Letter, supra* note 42, at 3.

**44.** *Custody Letter, supra* note 42, at 3.

**45.** *Custody Letter, supra* note 42, at 5.

**46.** *Plaintiff's Exhibits,* Exhibit 34 (*Central Authority for Denmark Application Form* ).

**47.** *Answer of Respondent to Petition,* Document No. 14 at 2.

spondent was estranged from her family due to abuse by family members.[48] Respondent also testified that she had not seen her mother for eight years. Respondent had, in fact, seen her mother on multiple occasions in the past eight years with and without Petitioner.

59. Respondent testified that Petitioner was physically and psychologically abusive and that her fear of Petitioner kept her from making her own decisions. However, Respondent admitted that Petitioner praised her for being independent and that Petitioner wanted for each of them to seek counseling during their marriage.

60. Both parties acted aggressively during arguments. According to the testimony of both parties, on one occasion, both parties hit each other.

61. Respondent admits Petitioner would not be a danger to BKL.

62. BKL would not face an intolerable situation if she returns to Denmark.

63. The Court finds the Respondent's testimony regarding Petitioner's abuse unpersuasive. However, the truth of that testimony does not change the finding of fact that the parties' last shared agreement was for BKL to habitually reside in Denmark. Nor does it change the finding of fact that Petitioner would not be a danger to BKL and that BKL would not face an intolerable situation if she returns to Denmark.

## III. CONCLUSIONS OF LAW

### A. The Parties' Burden of Proof

■ 1. The Hague Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980, governs civil proceedings filed in signatory countries for the recovery of abducted children. The United States and Denmark are signatories to the Convention. The International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.*, establishes the procedures for the implementation of the Convention.

2. The Convention and ICARA empower courts to order the return of children removed from their country of habitual residence, not to determine the merits of an underlying custody dispute. 42 U.S.C. § 11601(b); *England v. England*, 234 F.3d 268, 271 (5th Cir.2000). The Convention requires that a court shall order the return of a wrongfully removed or retained child.

3. The removal or retention of a child is wrongful if the petitioner proves by the preponderance of the evidence the following:

> (1) The child was removed from the child's country of habitual residence;
>
> (2) The removal was in breach of petitioner's rights of custody under the laws of the country of habitual residence; and
>
> (3) The petitioner was exercising those rights at the time of removal.

Hague Convention, arts. 3, 12.

4. Upon a finding of wrongful removal or retention, the Court has the discretion to refuse to order the return of the child if there is a "grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b).

### B. Habitual Residence

■ 5. Habitual residence is a mixed question of law and fact. *Berezowsky v.*

**48.** *Plaintiff's Exhibits*, Exhibit 49 (*September 22, 2014 email*); *Plaintiff's Exhibits*, Exhibit 53 (*Note to Petitioner from Respondent*).

*Ojeda,* 765 F.3d 456, 466 (5th Cir.2014). The habitual residence inquiry begins with parental intent. *Id.* Even though the ultimate question of habitual residence is a mixed question of law and fact, the question of parental intent is a question of fact based on the circumstances of each case. *Id.*

6. The threshold test is whether both parents intended for the child to abandon the habitual residence left behind. *Id.* When parents disagree as to the place of the child's habitual residence, a court must look to the last time their intentions were shared. *Id.* at 479. The intentions of the parents affect the length of time necessary for a child to acclimate and become habitually resident. *Larbie v. Larbie,* 690 F.3d 295, 311 (5th Cir.2012); *Mozes v. Mozes,* 239 F.3d 1067, 1077 (9th Cir.2001).

7. Parental intent is dispositive when the child is so young that he or she cannot decide the issue of residency or independently establish her own attachments to a place. *Berezowsky,* 765 F.3d at 466; *Larbie,* 690 F.3d at 310–311.

8. Private reservations about abandoning the prior habitual residence or establishing a new habitual residence, including hesitation about remaining in the marriage, are not sufficient to negate shared parental intent. *Berezowsky,* 765 F.3d at 466, *Nicolson v. Pappalardo,* 605 F.3d 100, 105 (1st Cir.2010); *Silverman v. Silverman,* 338 F.3d 886 (8th Cir.2003); *Mozes v. Mozes,* 239 F.3d 1067, 1076 (9th Cir.2001); *Feder v. Evans–Feder,* 63 F.3d 217 (3d Cir.1995). Once a family jointly takes steps to abandon the prior habitual residence, one parent's reservations do not negate shared intent. *Mozes,* 239 F.3d at 1077.

9. Habitual residence is not established when the removing spouse is coerced involuntarily to move to or remain in another country. *Silverman,* 338 F.3d at 900.

Courts have found coercion in cases of severe physical abuse of the spouse and children, cases in which one spouse concealed the purpose of the visit, and cases in which one spouse restrained the other spouse against her will in the new country by confiscating passports. *Id.; Maxwell v. Maxwell,* 588 F.3d 245 (4th Cir.2009); *Tsarbopoulos v. Tsarbopoulos,* 176 F.Supp.2d 1045, 1055–57 (E.D.Wash.2001); *Ponath v. Ponath,* 829 F.Supp. 363, 368 (D.Utah 1993).

10. The preponderance of the evidence establishes that the parties shared an intention to abandon their prior habitual residence in Germany.

11. The preponderance of the evidence establishes that prior to abandoning their habitual residence in Germany, the parties had a shared intention to abandon their habitual residence in the United States.

12. The preponderance of the evidence establishes that the last shared intention of the parties regarding BKL's habitual residence was that she habitually reside in Denmark.

13. Respondent was not coerced involuntarily to change BKL's habitual residence to Denmark.

14. The preponderance of the evidence establishes that BKL quickly acclimated to Denmark.

15. The preponderance of the evidence establishes that Denmark was BKL's habitual residence at the time of removal.

## C. Breach of Rights of Custody

16. "'Rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5. The rights of custody may be held either jointly or alone under the law of the country in

which the child was habitually residing immediately before the removal or retention. Hague Convention, art. 3. The Convention does not require a formal custody decree; rights of custody exist by mere operation of law. Hague Convention, art. 3. The term "rights of custody" is to be broadly interpreted so as to bring as many cases as possible under the purview of the Convention. *Abbott v. Abbott*, 560 U.S. 1, 130 S.Ct. 1983, 176 L.Ed.2d 789 (2010).

17. Petitioner has rights of custody under Danish law, including rights relating to the care of BKL and the right to determine BKL's residence.

18. The preponderance of the evidence establishes that the removal of BKL from Denmark was a violation of Petitioner's rights of custody.

### D. Exercise of Custody Rights

■ 19. The Convention and ICARA do not define what constitutes an "exercise" of rights of custody. The courts have interpreted "exercise" broadly and in its simplest, ordinary meaning. *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343–45 (5th Cir.2004). Even occasional contact with the child constitutes exercise of custody rights. *Id.*

20. The preponderance of the evidence establishes that Petitioner was exercising his rights of custody at the time of the removal.

### E. Intolerable Situation

■ 21. The Respondent has the burden of proving grave risk or an otherwise intolerable situation by clear and convincing evidence.[49] 42 U.S.C. § 11603(e)(2)(A). Even upon a finding of

grave risk or an otherwise intolerable situation under Article 13(b) of the Convention, a court possesses the discretion to order the return of the child.

22. The Courts have consistently held that Article 13(b) must be narrowly construed; otherwise a broad interpretation would cause the exception to swallow the rule and transform the Convention into an arena for custody disputes. *England v. England*, 234 F.3d 268, 271 (5th Cir.2000). Courts have generally recognized two types of grave risk or intolerable situations under Article 13(b): sending a child to a zone of war, famine, or disease; or cases of serious abuse or neglect. *Silverman*, 338 F.3d at 900 (internal citations omitted).

23. An "intolerable situation" must be grave and "was not intended to encompass return to a home where money is in short supply, or where educational and other opportunities are more limited than in the requested state. An example of an 'intolerable situation' is one in which a custodial parent sexually abuses the child." *Baxter v. Baxter*, 423 F.3d 363, 373 (3d Cir.2005) (as defined by the United States Department of State in *Hague International Child Abduction Convention, Text and Legal Analysis*, 51 Fed.Reg. 10494, 10510 (1988)).

24. Article 13(b) requires something greater than would normally be expected on taking a child away from one parent and passing the child to another. *England*, 234 F.3d at 271 (citing *Nunez–Escudero v. Tice–Menley*, 58 F.3d 374, 377 (8th Cir.1995)). Otherwise, courts would become inextricably involved in the merits of an underlying custody dispute and the "goals of the Convention could be easily circumvented." *Id.*[50]

---

49. The burden of proving an intolerable situation by "clear and convincing evidence" is a higher burden than Petitioner's burden to prove his case by a "preponderance of the evidence."

50. *See also Asvesta v. Petroutsas*, 580 F.3d 1000, 1021 (9th Cir.2009); *Walsh v. Walsh*,

810

25. Respondent contends sending BKL to Denmark would place her in an intolerable situation because she would be separated from her mother. While the Court heard testimony that BKL had not been separated from her mother for longer than three weeks before the parties' separation, the Court did not hear sufficient evidence to prove by clear and convincing evidence that an intolerable situation exists in Denmark as that term is defined in the context of Article 13(b). Therefore, Respondent has failed to meet her burden on this defense.

### F. Attorney's Fees

26. Any court ordering the return of a child shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, and transportation costs related to the return of the child, unless respondent establishes that such order would be clearly inappropriate. 42 U.S.C. § 11607(b)(3). Petitioner shall submit to this Court his motion for fees pursuant to the lodestar method.

### G. Summary

27. The Court finds that Petitioner, Matthew Loftis, has met his burden of proof to establish by the preponderance of the evidence that BKL was wrongfully removed from her habitual residence in Denmark. The Court further finds that Respondent, Jennifer Loftis, has failed to prove by clear and convincing evidence that returning BKL to Denmark would place BKL in an intolerable situation. Therefore, the Petition for Return of Child is granted.

221 F.3d 204, 218 (1st Cir.2000); *Friedrich v. Friedrich,* 78 F.3d 1060, 1068 (6th Cir.1996);

### IV. CONCLUSION

Based on all of the foregoing, the Court hereby

**ORDERS** that the Verified Petition for the Return of the Child to Petitioner (Document No. 1) is **GRANTED.** The Court further

**ORDERS** that the child, BKL, be promptly returned to Denmark with Petitioner Matthew Loftis.

The Court will issue a separate Final Judgment.